OPINION OF THE COURT
Lewis L. Douglass, J.
The petitioner in this action seeks an order pursuant to section 1104-a of the Business Corporation Law for judicial dissolution of several closely held corporations in which the petitioner, James Mardikos, owns one third of the shares, and the respondents, Jerry Arger and Andrew Argiraidi, brothers, each own one third of the shares, on the grounds that the conduct of the brothers towards him was oppressive, in that they effectively excluded him from participation in the business.
In 1965, Jerry Arger, his brother, Andrew, and James Mardikos, each contributed $500 to create Whale Chemical *1029 Company, a company which sells detergents to the maritime industry.
Each of the men brought a different perspective to the business. Jerry Arger was the salesman. His brother Andrew was a chemist with considerable expertise in detergents, and in order to establish credibility in the maritime industry, they needed someone involved in that industry, thus, they invited James Mardikos who then held a United States Coast Guard captain’s license and was also a marine superintendent, to join with them.
Now, 15 years later, as they fight over the control of the business they have built, each side claims that their contributions were more valuable than the others. But it is clear that they needed each other and that the success of their relationship is best measured by noting that from the initial $500 investment, they are now fighting over the ownership of corporations worth several million dollars.
After creating Whale Chemical, their first corporation, they later acquired Reliance Paint, which also grew, and 40% of that corporation was eventually sold to a large British holding company. In 1978 they created Marine Applicator, a blasting company which cleans by blasting the surfaces of the ships with detergents while the ships are in port.
These men present a typical business success story. They had a good idea, expertise, and established relationships in the industry. Throughout the years, as most lawyers would recommend, they conducted their business in the corporation form. These corporations were typical paper arrangements. They listed themselves as directors and officers, and each owned an equal amount of shares. Mardikos was listed as the president, Argiraidi as vice-president, and Arger as secretary-treasurer. They could have done business as partners, but sought to limit their liability and to enjoy the other lawful and proper benefits which flow from the corporation form. But, alas, like hundreds of other small businessmen, when they started the business they were getting along and thus they never executed any corporate “buy out”[1] agreement.
*1030 The breakup in their relationship first surfaced in December, 1980, when the brothers felt that Mardikos, then responsible for the blasting operation, had authorized too many “oral” approvals of work and that without written documentation from the shipyards they might not get paid for the “oral” transactions. Mardikos said there was nothing to worry about. They had a loud argument. The brothers then, for the first time in 13 years, asserted their formal corporate positions, and said, in effect, “Since we are all here, this is a directors’ meeting and we are removing you from managing this job and placing Jerry in charge.”
Petitioner argues that this directors’ meeting was defective in that it failed to conform with various procedures required by the Business Corporation Law. But it is beyond dispute that when all directors and all stockholders of a close corporation are present, the ritual of notice to themselves is not required and the principal owners can make management decisions by majority vote. To hold otherwise would place form over substance (Gerard v Empire Sq. Realty Co., 195 App Div 244).
Following this change, Mardikos continued to come to weekly meetings. He continued to receive the same benefits as the brothers and had full access to the office.
A few months later, another argument erupted when Jerry Arger fired Mardikos’ son. Arger later attempted to apologize, but these apologies did not lead to reinstatement since, by this time, the son, then unknown to the brothers, had started his own company to do the same business as his former employers.
Another shouting session took place in March, 1981, involving a dispute over how a bookkeeper was handling an invoice. Their senior manager, Anthony Saleh, threatened to quit. They consulted lawyers and were advised that it would not be wise to dissolve at that time due to other litigation in which they were involved. The details of these disputes, who was responsible, who said what, will never be known. The only clear fact is that the parties no longer get along and this lawsuit has deepened the rift and perhaps made reconciliation impossible.
*1031 The question before this court, therefore, is whether these circumstances warrant judicial dissolution pursuant to the provisions of section 1104-a of the Business Corporation Law.
Section 1104-a was enacted to provide relief to minority stockholders in close corporations who are being treated unfairly by the majority or who are being “squeezed out” because of “oppressive” conduct of the majority (Topper v Park Sheraton, 107 Misc 2d 25). The question is, what level of conduct by the majority is to be deemed “oppressive” so as to warrant the relief of judicial dissolution. In attempting to provide relief to unfairly treated minority stockholders, the New York Legislature had before it several options. It could have authorized dissolution on the very broad grounds which are available in Connecticut, where dissolution is authorized for “any good and sufficient reason” (Conn Gen Stats Ann, § 33.382, subd [b]), or the Legislature could have followed Indiana, which provides for the appointment of a receiver when necessary to provide “ample” justice (Ind Stats Ann, § 34-1-12-1). And, indeed, Professor F. Hodge O’Neil, in the leading treatise on the subject entitled “Oppression of Minority Stockholders”, which was submitted to the New York State Legislature when it was considering enactment of section 1104-a, suggested that minority stockholders should be accorded the broadest grounds for relief. The New York Legislature, however, elected to provide relief on the more narrow grounds of requiring a showing of “oppressive” conduct.
In New York State, judicial dissolution is not authorized because the parties no longer get along or that they disagree about how things should be done, even where the party who wants to withdraw is willing to divide the business in the fairest and most generous way. Judicial dissolution is only authorized in New York where there is evidence of conduct which fair-minded people would find objectionable (Matter of Beshar, NYLJ, Feb. 18, 1981, p 6, col 1; Matter of Gene Barry One Hour Photo Process, 111 Misc 2d 559). To hold otherwise and to suggest that section 1104-a authorizes dissolution without such a showing *1032 would, in fact, authorize “at will” dissolutions. That, as a basis for corporate dissolution, does not exist in New York.[2]
In deciding what constitutes unfair conduct, the court must view all of the circumstances. Here, where the petitioner alleges unfair conduct on the part of the majority-stockholders, his son, unknown to the majority, while employed by the majority, secretly organized his own corporation with his father’s indorsement, with the intent that the company would compete with the company which is the subject of this lawsuit. Though not a controlling factor in determining fairness, the petitioner, in the traditional words of the law should approach the court with “clean hands”. Moreover, in this case we are not confronted, as in Beshar {supra) or Topper (supra) with a newly formed corporation where the unspoken, but real expectations, which surround the excitement of a new deal failed to materialize as, for example, where one of the partners relocates to New York expecting to work in the business as his major source of employment. Here, we are confronted with 13 years of growth followed by disagreement in the last two years.
In addition, petitioner admits that he proposed that his associates buy him out, but was dissatisfied with the speed with which they responded, and, thereafter instituted this action. But considering a 15-year relationship, the size of the present business, its involvement in other major litigation, it is difficult to conclude that the majority was any more “unfair” than the petitioner in asking for more time to consider a major reorganization of their companies. And, surely, section 1104-a was not enacted to create a mechanism wherein the minority can compel a “buy out” in the absence of showing unfair conduct.
*1033 It may well be that the New York State Legislature should create some form of “no fault” procedure to allow parties in close corporations to go their separate ways. The Legislature had that option but rejected it in favor of a procedure that requires a showing of “oppressive” behavior. Since the petitioner has failed to show such oppressive behavior, application for dissolution is denied.
Since there is no evidence in this record that the majority has offered to “buy out” the minority, nor any evidence that the majority inadvertently elected to purchase the petitioner’s interest by the nature of the pleadings as in the case of Matter of Gene Barry One Hour Photo Process (supra, at p 566) or Topper (supra, at p 28) there are no grounds to stay the proceedings for a determination of fair value as provided in section 1118 of the Business Corporation Law.
Recognizing the hostility between these parties which was obviously exacerbated by emotion which permeated the evidentiary hearing, it may well be that future conduct may evolve into “oppressive” conduct. It is thus appropriate to note the following assumptions which support this decision:
(1) Petitioner, provided he fully participates in the business and does not engage in a competing business will continue to receive the same salary and fringe benefits as do the respondents;
(2) That all books and records will be made available to petitioner or his agents;
(3) That the parties will extend to each other a reasonable degree of civility when in the corporate premises; and
(4) That petitioner’s sons will be re-employed, if they wish, provided they are not engaged in competing businesses.
To the extent that any of these assumptions, which the court finds existed at the commencement of the action, change, the petitioner is free to institute such action as he feels is appropriate.
attorneys’ fees
Subsequent to the hearing, the petitioner complained that corporation funds were being used by the brothers to *1034 pay the legal fees incurred in defending this action. Although this issue was not contained in the original pleadings, in an effort to resolve all outstanding issues between the parties, this court will nevertheless dispose of that issue.
Section 1104-a was enacted to provide relief to small business people doing business in the corporate form. As these lawsuits develop it is likely that in many situations the only available cash will be the funds in the business. The court should, where a challenge is made to the payment of the fees, evaluate each situation in the spirit of Diamond v Diamond (307 NY 263) and seek to place the parties on an equal footing. Ordinarily, the issue will arise when the petitioner seeks to enjoin the use of corporation funds by the majority in defending the action. In some situations, the denial of the use of corporation funds, in an action seeking to dissolve a small corporation, may effectively prevent the majority from defending a groundless claim. In other situations, where the financial circumstances are different, fairness may suggest that the court enjoin the majority from taking any action which would deplete the corporate assets and, in that situation, order the majority to pay for their lawyer with their own funds. In this case, the fees have already been disbursed and recognizing the length of the hearings and the extensive briefs prepared by both sides, the expenditure of the fees already paid is approved since the law generally provides for the payment of fees for attorneys defending actions which, if successful, would result in damage to the corporation (New York Cent. R. R. Co. v New York & Harlem R. R. Co., 275 App Div 604; Matter of Massie v Textile Realty Corp., 8 Misc 2d 1018) and here the defense has been successful.
In the event that further litigation arises in this matter, petitioner is free at the time to seek to enjoin the payment of further fees, and the issue can then be fully litigated.

. For discussion of “buy out” agreements, see O’Neil, Closed Corporations.

. Petitioner’s argument that Matter of Gordon & Weiss (Weiss-Gordon) (32 AD2d 279), and Matter of Surchin (55 Misc 2d 888) which held that when a court is considering whether to exercise its discretion to grant dissolution to a “deadlocked” corporation, pursuant to section 1104 of the Business Corporation Law, the court should-treat close corporations as partnerships, has established a rule that close corporations in other judicial dissolution proceedings are to be treated as partnerships is misplaced. These cases merely set forth the guidelines which should be followed in deciding whether to exercise its discretion in “deadlocked” situations, and thus are wholly inapplicable to a proceeding involving a contest between minority and majority under the provisions of section 1104-a of the Business Corporation Law.