■ In the Matter of MAYBELLE MINTZ, Appellant. ASTORIA HOLDING CORP., Respondent.—In a proceeding pursuant to Business Corporation Law § 1104-a to dissolve the Astoria Holding Corp. (Astoria) and for the appointment of a receiver pursuant to Business Corporation Law § 1113, petitioner appeals from a judgment of the Supreme Court, Kings County (Monteleone, J.), dated February 3, 1984, which dismissed the proceeding.

Judgment reversed, on the law, with costs, petition reinstated, and matter remitted to Special Term for further proceedings in accordance herewith.

In this proceeding, petitioner Maybelle Mintz, a minority stockholder in Astoria, a close corporation, seeks the dissolution of that corporation (Business Corporation Law § 1104-a) and the appointment of a receiver (Business Corporation Law § 1113). The subject corporation, which is principally a real estate holding company, was originally organized in 1958 by certain members of the Mintz family, including petitioner's husband, Lewis Mintz. Its principal assets are a shopping center in Brooklyn and a 20-acre parcel of land in Lake Mohegan, New York, which is in the process of being developed as a garden apartment complex.

Petitioner acquired her interest in the corporation—now approximately 30% of the outstanding shares—in 1959 when

her husband formally transferred his shareholder interest to her. Although petitioner apparently was never involved in the day-to-day operations or management of Astoria, her husband served as a corporate officer until 1968, when the first of a series of strokes forced him to withdraw from active participation in the business. Apparently, petitioner's son, Alan Mintz, was indirectly involved in the business for a short period of time as a principal of a management company, Management Associates, which managed the assets of Astoria. The services of this company, the principals of which were Alan Mintz and Max Mintz, one of the original shareholders of Astoria, were terminated in 1972 based upon a decision that Astoria could more economically manage its affairs on its own. This was the last active participation by petitioner's immediate family in the corporate business.

The last dividends paid by Astoria were in 1970 and 1971, in the total amount of over $1,500,000 representing funds acquired from the sale of certain surplus properties.

In July 1972, Astoria, acting pursuant to a shareholders' agreement (which petitioner signed), acquired the Lake Mohegan property for the purpose of developing an apartment complex. The same agreement designated Max Mintz to act with full authority in all matters pertaining to the development of that property. Over the course of the next 11 years, Astoria expended over $700,000 in developing this property. Due to numerous delays in obtaining the necessary permits and approvals, occasioned by challenges arising from, *inter alia,* the New York State Departments of Health and Environmental Conservation, however, construction had not yet begun as of July 1983, when this proceeding was commenced.

In 1977, Astoria obtained a new mortgage on the Brooklyn property in the amount of $4,400,000. While this transaction netted the corporation a cash excess of over $1,600,000, those funds were retained for financing of the Lake Mohegan project rather than being distributed as dividends. That same year, however, Astoria repurchased 27 shares of stock from one shareholder as treasury stock for the sum of $1,400,000.

Following a successful effort begun in 1978 in a proceeding pursuant to Business Corporation Law § 624 to inspect the corporate records, petitioner commenced the instant proceeding in July 1983 seeking dissolution of Astoria pursuant to Business Corporation Law § 1104-a. The petition alleges that the majority shareholders engaged in various forms of oppressive conduct toward her, including the systematic exclusion of

her from the day-to-day operations of the company, the failure to authorize dividends or cash distributions for over 10 years, the failure to provide notice of shareholders' and other corporate meetings, the failure to accord her the right to vote for the election of directors, and the failure to regularly account to her with regard to corporate operations and affairs. The "freeze out" of petitioner, it is alleged, constituted a failure to meet the reasonable expectations of petitioner as a shareholder in a close corporation, to participate in its management and operation and to share in its profits. Specifically, she charged that she was never notified of the refinancing of the mortgage on the Brooklyn property, nor of the decision to expend $1,400,000 to acquire the treasury stock. She also noted that the heightened alienation between her and her husband and the other shareholders resulted from a judgment recovered by her husband against the corporation, and alleged that following commencement of that action in 1976, the flow of all information to her regarding corporate affairs ceased. She also pointed out that due to the age of her husband and herself—both being over 70 years of age—the failure to make any cash distribution raised the possibility that they would never have the opportunity to enjoy the fruits of their investment in their lifetimes.

Respondent answered the petition and submitted an affidavit by Max Mintz, its president and a director of Astoria, denying petitioner's charges of oppressive conduct. While acknowledging the failure to declare any dividends since 1972, respondent asserted that this decision was based upon a sound good-faith business judgment of the corporate directors. Astoria's cash surpluses, it contended, were being retained in order to finance construction of the apartment complex on the Lake Mohegan property and to meet payments connected with refinancing the $4,400,000 mortgage on the Brooklyn shopping center. In response to the claims that petitioner was being systemically excluded from the day-to-day affairs of Astoria, it was noted that Max Mintz had been authorized in writing to handle the affairs of the Lake Mohegan project and it was further asserted that neither petitioner nor her husband were capable of assisting in the day-to-day affairs of either that project or the shopping center. As to the failure to provide notice of stockholder meetings, respondent asserted that, like many family-owned close corporations, Astoria had operated successfully without the necessity of formal meetings. A request by petitioner for an indefinite postponement of a formal meeting of which she was notified was noted as evidence of

her lack of interest in such meetings. (This meeting was scheduled after the commencement of this proceeding.) Respondent also asserted that petitioner had never indicated, from the inception of Astoria's existence or thereafter, that it was her intention or expectation to participate in the day-to-day affairs of the corporation. It alleged further that petitioner's expectations to share in the profits had been satisfied by the generous dividends paid up until 1972, when the best interests of the corporation required that all shareholders stop receiving dividends.

In response to claims that the refinancing of the shopping center mortgage in 1977 and the repurchase of 27 shares of stock as treasury shares for $1,400,000, also in 1977, were done without notice to petitioner and without her consent, respondent argued that the refinancing was done for the purpose of obtaining cash to aid financing of the Lake Mohegan project and were carried out under Max Mintz' authority to oversee that project. The repurchase of the stock, it was asserted, was in no way prejudicial to petitioner and she should not be heard to complain over six years later that this was prejudicial conduct toward her. Finally, respondent argued that the dissolution of the corporation would, if carried out, have a disastrous financial effect on all of the shareholders, including petitioner.

In a reply affidavit, petitioner's son, Alan Mintz, charged a number of improprieties in the manner in which Astoria's finances were being managed and challenged the soundness and the good faith of the decision to withhold dividends for over 12 years. Max Mintz submitted a further affidavit on behalf of respondent, refuting these charges.

Special Term dismissed the petition without a hearing, finding that petitioner had failed to substantiate her claims of oppressive conduct. We reverse and remit the matter to Special Term for a hearing.

Business Corporation Law § 1104-a provides a mechanism whereby holders of 20% or more of a closely held corporation may petition for its dissolution on the grounds, *inter alia,* that "[t]he directors or those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders" (Business Corporation Law § 1104-a [a] [1]). In *Matter of Kemp & Beatley (Gardstein)* (64 NY2d 63, 71-72), the Court of Appeals provided some guidance in applying the term "oppressive conduct" to proceedings under the statute. The court stated:

"The statutory concept of 'oppressive actions' can, perhaps, best be understood by examining the characteristics of close corporations and the Legislature's general purpose in creating this involuntary-dissolution statute. It is widely understood that, in addition to supplying capital to a contemplated or ongoing enterprise and expecting a fair and equal return, parties comprising the ownership of a close corporation may expect to be actively involved in its management and operation (O'Neal, Close Corporations [2d ed], §§ 1.07-1.09; Davidian, Corporate Dissolution in New York: Liberalizing the Rights of Minority Shareholders, 56 St John's L Rev 24, 26; Note, Involuntary Dissolution of Close Corporations for Mistreatment of Minority Shareholders, 60 Wash U LQ 1119, 1139-1143; Ann., 56 ALR3d 358, 363-367; see, also, *Matter of Topper v Park Sheraton Pharmacy,* 107 Misc 2d 25; *Matter of Barry One Hour Photo Process,* 111 Misc 2d 559). The small ownership cluster seeks to 'contribute their capital, skills, experience and labor' toward the corporate enterprise (*Kruger v Gerth,* 16 NY2d 802, 805 [Desmond, Ch. J., dissenting]; see *Matter of Pivot Punch & Die Corp.,* 15 Misc 2d 713, 715-716 [Jasen, J.]; Israels, Close Corporation and the Law, 33 Cornell LQ 488) * * *

"Shareholders enjoy flexibility in memorializing these expectations through agreements setting forth each party's rights and obligations in corporate governance (see, generally, Kessler, Shareholder-Managed Close Corporation Under the New York Business Corporation Law, 43 Fordham L Rev 197; Davidian, *op cit.,* 56 St John's L Rev 24, 29-30, and nn 21-22). In the absence of such an agreement, however, ultimate decision-making power respecting corporate policy will be reposed in the holders of a majority interest in the corporation (see, e.g., Business Corporation Law, §§ 614, 708). A wielding of this power by any group controlling a corporation may serve to destroy a stockholder's vital interests and expectations.

"As the stock of closely held corporations generally is not readily salable, a minority shareholder at odds with management policies may be without either a voice in protecting his or her interests or any reasonable means of withdrawing his or her investment. This predicament may fairly be considered the legislative concern underlying the provision at issue in this case; inclusion of the criteria that the corporation's stock not be traded on securities markets and that the complaining shareholder be subject to oppressive actions supports this conclusion.

"Defining oppressive conduct as distinct from illegality in the present context has been considered in other forums. The question has been resolved by considering oppressive actions to refer to conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise (see, e.g., *Mardikos v Arger*, 116 Misc 2d 1028; *Matter of Barry One Hour Photo Process*, 111 Misc 2d 559, *supra; Matter of Topper v Park Sheraton Pharmacy*, 107 Misc 2d 25, *supra; Capitol Toyota v Gervin*, 381 So 2d 1038 [Miss]; *Exadaktilos v Cinnaminson Realty Co.*, 167 NJ Super 141, 153-156, affd 173 NJ Super 559; *Masinter v Webco Co.*, 262 SE2d 433 [West Va]; O'Neal, Oppression of Minority Shareholders, §§ 3.01-3.11; O'Neal, Close Corporations: Existing Legislation and Recommended Reform, 33 Business Lawyer 873; Afterman, Statutory Protection for Oppressed Minority Shareholders: A Model for Reform, 55 Va L Rev 1043; but cf. *Polikoff v Dole & Clark Bldg. Corp.*, 37 Ill App 2d 29, 36; *Baker v Commercial Body Bldrs.*, 264 Ore 614, 630). This concept is consistent with the apparent purpose underlying the provision under review. A shareholder who reasonably expected that ownership in the corporation would entitle him or her to a job, a share of corporate earnings, a place in corporate management, or some other form of security, would be oppressed in a very real sense when others in the corporation seek to defeat those expectations and there exists no effective means of salvaging the investment.

"Given the nature of close corporations and the remedial purpose of the statute, this court holds that utilizing a complaining shareholder's 'reasonable expectations' as a means of identifying and measuring conduct alleged to be oppressive is appropriate. A court considering a petition alleging oppressive conduct must investigate what the majority shareholders knew, or should have known, to be the petitioner's expectations in entering the particular enterprise. Majority conduct should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture are not fulfilled. Disappointment alone should not necessarily be equated with oppression.

"Rather, oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture. It would be inappropriate, however, for us in this case to delineate the contours of the courts' consideration in determining whether directors have been guilty of oppressive

conduct. As in other areas of the law, much will depend on the circumstances in the individual case".

A review of the allegations in the record before us reveals a substantial number of factual issues regarding whether the actions of the corporate directors have served to defeat the reasonable expectations of petitioner as to her investment. When the initial investment in the corporation was made by petitioner's husband it appears that, in addition to regular dividends, his family benefited from compensation received for his efforts in the management of the business. Now it is alleged that while certain of the other original investors continue to receive substantial benefits from the corporation through salaries and the like, petitioner—although the largest single corporation stockholder—and her family, have received no return on the investment for over 12 years. The record also reveals a number of other allegations regarding the corporate operation which call into question the good faith and judgment of the directors in freezing all of the cash surpluses of Astoria for all of these years.

Under these circumstances, a determination of whether petitioner has been the victim of oppressive conduct can only be made upon a full development of the facts after an opportunity for discovery (*see, Matter of Sahara Beach Club, Inc.* [*Frenchman—Meyers*], 3 AD2d 933). Only upon such a record, and not upon acrimonious affidavits, can it be determined whether the corporation has been engaged in oppressive conduct to freeze out petitioner, by stockpiling a surplus or by attempting to force her to sell below value or whether the other shareholders have been receiving dividends in the form of excessive salaries or other benefits to the exclusion of petitioner. Accordingly, it was error for Special Term to dismiss the petition without conducting a hearing. We see no basis at this juncture in the proceeding, however, for the appointment of a receiver (Business Corporation Law § 1113). Lazer, J. P., Mangano, Brown and O'Connor, JJ., concur.