[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs Catherine Morrow, Madeline Morrow, Cheryl Morrow and Ray Morrow (hereinafter collectively referred to as the "Morrows") brought this action as minority stockholders owning 46.265% of its common stock[1] against the defendant Prestonwold, Inc. seeking to dissolve the corporate entity and the appointment of a receiver to wind up and liquidate the property of the corporation. Hugo Colombi, Jr., Michael Colombi, Matthew Colombi, Janet Colombi-Coleman and Gary Coleman (hereinafter collectively referred to as the Colombis), owning 53.735% of the common stock[2] object to the dissolution of the Prestonwold.[3]
The Morrows and Colombis are related. Madeline Morrow is the sister of Hugo Colombi, Jr. and they are the children of the deceased Hugo Colombi, Sr., who owned all the shares of Prestonwold. The Morrows and Colombis received their shares of common stock by means of an inheritance from Hugo Colombi, Sr. when he died in 1975.
The principal assets of Prestonwold consists of two parcels of land in North Stonington, Connecticut. The first parcel consists of approximately 126 acres of undeveloped land. The second parcel consists of 89 acres of undeveloped land which includes a 54 acre lake and several cottages, one of which is known as the "Brown Cottage". The property was purchased in 1945 by Hugo Colombi, Sr. and his wife and originally consisted of 1,000 acres. Over the course of years, parcels were sold and some acreage developed. The parties stipulated that the two remaining parcels of undeveloped land currently have a market value of between $500,000 to $600,000.
Since the death of Hugo Colombi, Sr. up until 1992 the property was managed by the Hugo Colombi, Jr. and Madeline Morrow without significant discord, with Hugo Colombi, Jr. serving as president and Madeline Morrow as secretary/treasurer. Both officers served without compensation.[4]
Hugo Colombi, Jr. occupied the Brown cottage since 1958 as a summer residence and until 1992 without the payment of any rent.
In 1992, dissension between the Morrows and Colombis developed. At the August 22, 1992 Board of Directors meeting, which was contentious, the Morrows objected to the annual rent-free use of the Brown cottage by Hugo Colombi, Jr. As a result, the Board of Directors by a vote of 4 to 3 along family lines approved a rental of $300 per month over the objections of the Morrows who believed the rent should have been $600 per month. The same majority voted, for the first time, to compensate those members of the family who did work for Prestonwold[5] which would primarily benefit the Colombis because Madeline Morrow no longer served as secretary/treasurer. Janet Colombi-Coleman was elected to replace her.
During the 1995 stockholders meeting, Catherine Morrow moved and it was CT Page 16927 unanimously agreed "that for sake and benefit of all shareholders of Prestonwold, Inc. that this corporation in addition to management plans laid out earlier proceed pro actively to the bulk sale of this property." In 1996, Prestonwold obtained a professional appraisal of the property. Notwithstanding the aforesaid vote, a motion made by Catherine Morrow at the April, 1996 stockholders meeting that all assets of Prestonwold be put up for bulk sale, using the appraisal as guidance for the listing price, was defeated along family lines.
The subsequent stockholders meetings became more contentious. Hugo Colombi came to one meeting with an egg timer informing the stockholders that they were limited to only ten minutes for each issue.
Since 1993, Hugo Colombi, Jr. failed to respond to requests for information about the corporation and its finances from the Morrows. For example, Catherine Morrow requested copies of Prestonwold's tax returns, which were never provided. Indeed, those tax returns for the years of 1993 through 2000 indicate a loss for each year.[6] If the sums that the Colombis' claim are due to them as compensation over the course of the years since 1992, which have not been paid, were also taken into account those losses incurred by Prestonwold would be significantly greater. As a result of the failure to receive this information, the Morrows called for a special meeting of the Board of Directors in December, 1999. The Colombis responded by voting to amend the by-laws to provide that a special meeting of the Board of Directors could only be called by the President, or upon request of three directors which would make it impossible to call a special meeting over the objection of the Colombis.[7]
During April of 1999, Hugo Colombi, Jr. attempted to negotiate a division of the property between the two families. On April 15, 1999, Hugo Colombi, Jr. sent a letter to all shareholders wherein he stated he recognized the diverging interests of the two families. "It is apparent that some shareholders want to sell all of the Corporation's real estate and presumably dissolve the company, while others do not want to sell and want the Corporation to continue." In this letter, Hugo Colombi outlined a proposal to separate the interests of the Morrows from Prestonwold by exchanging their shares of Prestonwold stock plus Madeline Morrow's interest in a nearby two acre parcel (not owned by Prestonwold) for the 126 acre parcel. In response, at the May 1999 stockholders meeting, the Morrows rejected Hugo Colombi's proposal, believing that it was inadequate and unfairly included Madeline Morrow's two acre parcel. The Morrows presented two alternate proposals: 1) exchanging the Morrow shares of Prestonwold for the 89 acre parcel; or 2) a cash purchase of the Morrow's shares based on appraised values of Prestonwold's real estate. Hugo Colombi, Jr. stated that he wished to consider the Morrows' CT Page 16928 proposals. No further negotiations were held.
The Morrows brought this action for the involuntary dissolution of Prestonwold pursuant to General Statutes § 33-896.[8] Section33-896(a) provides in part the following: "The superior court for the judicial district where the corporation's principal office or, if none in this state, its registered office, is located may dissolve a corporation: (1) In a proceeding by a shareholder if it is established that: (A) The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent; or (B) the corporate assets are being misapplied or wasted." The Morrows focus solely on the claim that the conduct of those in control of Prestonwold has been "oppressive."
Although the legislature in adopting § 33-896 as part of the Connecticut Business Corporation Act has directed that the court look to the Model Business Corporation Act and its commentary for guidance when interpreting Connecticut law,[9] the model act and its commentary do not provide a definition of the word "oppressive."
Other trial courts in Connecticut have relied on New York law[10] to determine if the conduct complained of is oppressive. Devivo v. Devivo, Superior Court, judicial district of Hartford at Hartford, Docket No. 581020 (May 8, 2001, Satter, J.T.R.) (30 Conn.L.Rptr. 52, 54);[11]Stone v. R.E.A.L. Health, P.C., Superior Court, judicial district of New Haven at New Haven, Docket No. 414972 (November 15, 2000, Munro, J.) (29 Conn.L.Rptr. 219, 225).[12]
In determining the contours of oppressive conduct, the New York Court of Appeals examined the nature of a closely held corporation which the drafters of the Model Business Corporation Act obviously considered when fashioning the remedy of involuntary dissolution of a corporation by minority stockholders. Those considerations are worthwhile repeating in this decision.
"It is widely understood that, in addition, to supplying capital to a contemplated or ongoing enterprise and expecting a fair and equal return, parties comprising the ownership of a close corporation may expect to be actively involved in its management and operation. The small ownership cluster seeks to `contribute their capital, skills, experience and labor' toward the corporate enterprise.
"As a leading commentator in the field has observed: "Unlike the typical shareholder in a publicly held corporation, who may be simply an investor or a speculator and cares nothing for the responsibilities of management, the shareholder in a close corporation is a co-owner of the CT Page 16929 business and wants the privileges and powers that go with ownership. His participation in that particular corporation is often his principal or sole source of income. As a matter of fact, providing employment for himself may have been the principal reason why he participated in organizing the corporation. He may or may not anticipate an ultimate profit from the sale of his interest, but he normally draws very little from the corporation as dividends. In his capacity as an officer or employee of the corporation, he looks to his salary for the principal return on his capital investment, because earnings of a close corporation, as is well known, are distributed in major part in salaries, bonuses and retirement benefits.' (O'Neal, Close Corporations [2d ed.], § 1.07, at pp. 21-22 [n. omitted].)
"Shareholders enjoy flexibility in memorializing these expectations through agreements setting forth each party's rights and obligations in corporate governance (see, generally, Kessler, Shareholder-Managed Close Corporation Under the New York Business Corporation Law, 43 Fordham L. Rev. 197, Davidian, op. Cit., 56 St. John's L. Rev. 24, 29-30, and nn. 21-22). In the absence of such an agreement, however, ultimate decision-making power respecting corporate policy will be reposed in the holders of a majority interest in the corporation (see, e.g., Business Corporation Law, §§ 614, 708). A wielding of this power by any group controlling a corporation may serve to destroy a stockholder's vital interests and expectations.
"As the stock of closely held corporations generally is not readily salable, a minority shareholder at odds with management policies may be without either a voice in protecting his or her interests or any reasonable means of withdrawing his or her investment. This predicament may fairly be considered the legislative concern underlying the provision at issue in this case; inclusion of the criteria that the corporation's stock not be traded on securities markets and that the complaining shareholder be subject to oppressive actions supports this conclusion." (Internal citations and quotation marks omitted in part) Matter of Kempand Beatley, Inc., 64 N.Y.2d 63, 72-73, 473 N.E.2d 1173 (1984).
The New York Court of Appeal concluded that to determine whether the conduct of the majority is oppressive, it should adopt the "reasonable expectation" test. "Given the nature of close corporations and the remedial purpose of the statute, this court holds that utilizing a complaining shareholder's `reasonable expectations' as a means of identifying and measuring conduct alleged to be oppressive is appropriate. A court considering a petition alleging oppressive conduct must investigate what the majority shareholders knew, or should have known, to be the petitioner's expectations in entering the particular enterprise. Majority conduct should not be deemed oppressive simply CT Page 16930 because the petitioner's subjective hopes and desires in joining the venture are not fulfilled. Disappointment alone should not necessarily be equated with oppression. Rather, oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture." Matter of Kempand Beatley, Inc., supra, 64 N.Y.2d at 73.
"[T]he question of what is `oppressive' conduct by those in control of a `close' corporation as its majority stockholders is closely related to what we agree to be the fiduciary duty of a good faith and fair dealing owed by them to its minority stockholders." Baker v. Commercial BodyBuilders, Or., 507 P.2d 387, 394 (1973).
In applying the reasonable expectation test in the present case, the Colombis would have this court believe that it should look to the reasonable expectations of Hugo Colombi, Sr. and those expectations are that the land be held primarily for recreational use by the family. Although that may have been Hugo Colombi Sr.'s reasonable expectation, that is not the lens to be used under the corporate dissolution statute. Rather it is what the majority knew or should have known to be the reasonable expectation of the Morrows when they received their inheritance of the stock in Prestonwold in 1975. It is clear to the court that those reasonable expectations where economic gain and the participation in the management of the corporation and not to hold the land for the pleasure of the Colombis.
In the present case, the Morrows have an investment in Prestonwold in the amount ranging from $231,225 to $277,590 (46.265% of $500,000 to $600,000) and they receive no cash return. Although they may hope that the value of the land will increase, the bottom line is that you can't eat land. The court finds that the failure to pursue a sale of the land in accordance with the unanimous vote of the stockholders in 1995 and the failure to subsequently pursue a sale of the land constitutes oppressive conduct within the meaning of § 33-896(a).
Furthermore, it was the reasonable expectation of the Morrows that Madeline Morrow continue in the active management of the Prestonwold as she had done since 1978 until she was voted out of office in 1992.
Even if the court should employ the following alternative standard for defining "oppressive conduct", the Morrows would still be entitled to the relief they seek. "The second definition is derived from British law, and describes `oppressive conduct' as burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visible departure from the CT Page 16931 standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely. (Baker v. Commercial Body Builders, Inc., 264 Or. 614, 628-629,507 P.2d 387; comment, 1965 Duke LJ 128, 134, quoting Scottish Co-opWholesale Soc'y., Ltd. v. Meyer [1958], 3 All E.R. 66, 71 86 [HL] andElder v. Elder and Watson, Ltd. [1952], Sess Cas, 49, 55, construing The Companies Act of 1948, 11 12 Geo, 6, ch. 38 § 320.)
"This definition, too, has found support in New York cases. (Matter ofBeshar, N YL.J., Feb. 18, 1981, p. 6, col. 1.) In Mardikos v. Arger,116 Misc.2d 1028, 457 N.Y.S.2d 371, this approach was summarized by defining `oppression' as `conduct which fair-minded people would find objectionable.' (Mardikos v. Arger, supra, p. 1031, 457 N.Y.S.2d 371.)"Gimpel v. Bolstein, 125 Misc.2d 45, 477 N.Y. Sup.2d 1014, 1018 (1984).
When the conduct of the Colombis, in particular Hugo Colombi, Jr., is taken into account — that is, the failure to disseminate information, the failure to conduct corporate affairs in a fair manner, the threats of breaching the dam[13] which could result in penalties from the Department of Environmental Protection, the failure to advise the stockholders of the dam problem in a timely fashion and the self-dealing with respect to the rental of the Brown house — it overwhelmingly constitutes oppressive conduct.
Although proceeding under the involuntary dissolution statute, it is nevertheless an equitable proceeding. In re Lalaland DevelopmentCorporation, 152 N.W.2d 758, 765 (Minn.) (1967). This court is not unmindful of the equitable principle it should only grant "the drastic remedy of dissolution with great caution and not in doubtful cases. It is fundamental that a receiver shall be interposed to conserve and not to destroy." Id.
The statutory scheme for judicial dissolution also provides that the court may appoint a custodian, General Statute, § 33-898(a); and subsequently may redesignate the custodian as a receiver. General Statute § 33-898(d). Under the circumstances of this case, because of the pending problem with the Department of Environmental Protection with respect to the dam, (see footnote 13), the court is of the opinion that it would be in the best interests of the corporation and its stockholder at this time to designate a custodian for Prestonwold.
The custodian to be appointed shall exercise all the powers of the board of directors and officers of Prestonwold to the extent necessary to manage the affairs of the corporation in the best interests of its stockholders. General Statutes, § 33-898(d). The custodian will also be directed to (1) investigate the complaints of the Department of CT Page 16932 Environmental Protection; (2) make recommendations to the court as to the manner of disposing of the land, either in bulk sale or otherwise, that would maximize the return to the stockholders; and (3) make any other recommendations to the court that will be in the best interests of Prestonwold.
The court will allow the Morrows and Colombis time to confer until February 1, 2002 with respect to who should fill the position of custodian. If the Morrows and Colombis unanimously recommend a person to assume those duties, the court will consider the appointment of that person as custodian. If the parties fail to do so on or before February 1, 2002, the court will act on its own. This matter is continued to February 1, 2002 at 10:00 A.M. At that hearing the court will consider other duties to assign to the custodian that may be suggested by counsel.
The undersigned judge will retain jurisdiction over this file.
Robert I. Berdon, Judge Trial Referee