[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] AMENDED MEMORANDUM OF DECISION[1]
The plaintiffs Catherine Morrow, Madeline Morrow, Cheryl Morrow and Ray Morrow (hereinafter collectively referred to as the "Morrows") brought this action as minority stockholders owning 46.265% of its common stock[2] against the defendant Prestonwold, Inc. seeking to dissolve the corporate entity and the appointment of a receiver to wind up and liquidate the property of Prestonwold. Hugo Colombi, Jr., Michael Colombi, Matthew Colombi, Janet Colombi-Coleman and Gary Coleman (hereinafter collectively referred to as the Colombis), owners of 53.735% of the common stock of Prestonwold,[3] object its dissolution.[4] The Morrows and Colombis are related. Madeline Morrow is the sister of Hugo Colombi, Jr. and they are the children of the deceased Hugo Colombi, Sr., who owned all the shares of Prestonwold. The Morrows and Colombis received their shares of common stock by means of an inheritance from Hugo Colombi, Sr. when he died in 1975.
The principal assets of Prestonwold consists of two parcels of land in North Stonington, Connecticut. The first parcel consists of approximately 126 acres of undeveloped land. The second parcel consists of 89 acres of undeveloped land which includes a 54 acre lake and several cottages, one of which is known as the "Brown cottage". The property was purchased in 1945 by Hugo Colombi, Sr. and his wife and originally consisted of 1,000 acres. Over the course of years, parcels were sold and some acreage developed. The parties stipulated that the two remaining parcels of undeveloped land currently have a market value of between $500,000 to $600,000.
Since the death of Hugo Colombi, Sr. in 1975 to 1992 the property of Prestonwold was managed by the Hugo Colombi, Jr. and Madeline Morrow CT Page 4041 without significant discord, with Hugo Colombi, Jr. serving as president and Madeline Morrow as secretary/treasurer. Both officers served without compensation.[5] Hugo Colombi, Jr. since 1958 occupied the Brown cottage as a summer residence and until 1992 without the payment of any rent.
In 1992, dissension between the Morrows and Colombis developed. At the August 22, 1992 Board of Directors meeting, which was contentious, the Morrows objected to the annual rent-free use of the Brown cottage by Hugo Colombi, Jr. which he occupied for approximately seventeen years after the death of Hugo Colombi, Sr. As a result, the Board of Directors approved a rental of $300 per month over the objections of the Morrows who believed the rent should have been $600 per month. The same majority voted at that meeting, for the first time, to compensate those members of the family who did work for Prestonwold[6] which would primarily benefit the Colombis because Madeline Morrow no longer served as secretary/treasurer. Janet Colombi-Coleman was elected to replace her. The decision of the majority to acquire this compensation for the benefit of the Colombis will further adversely effect the financial position of Prestonwold.[7]
During the 1995 stockholders meeting, Catherine Morrow moved and it was unanimously agreed "that for sake and benefit of all shareholders of Prestonwold, Inc. that this corporation in addition to management plans laid out earlier proceed pro actively to the bulk sale of this property." In 1996, Prestonwold obtained a professional appraisal of the property. Notwithstanding the aforesaid 1995 vote, a motion made by Catherine Morrow at the April, 1996 stockholders meeting that all assets of Prestonwold be put up for bulk sale, using the appraisal as guidance for the listing price, was defeated along family lines.
During April of 1999, Hugo Colombi, Jr. attempted to negotiate a division of the property between the two families. On April 15, 1999, Hugo Colombi, Jr. sent a letter to all shareholders wherein he stated he recognized the diverging interests of the two families. "It is apparent that some shareholders want to sell all of the Corporation's real estate and presumably dissolve the company, while others do not want to sell and want the Corporation to continue." In this letter, Hugo Colombi outlined a proposal to separate the interests of the Morrows from Prestonwold by exchanging their shares of Prestonwold stock plus Madeline Morrow's interest in a nearby two acre parcel (not owned by Prestonwold) for the 126 acre parcel. In response, at the May 1999 stockholders meeting, the Morrows rejected Hugo Colombi's proposal, believing that it was inadequate and unfairly included Madeline Morrow's two acre parcel. The Morrows presented two alternate proposals: 1) exchanging the Morrow shares of Prestonwold for the 89 acre parcel; or 2) a cash purchase of CT Page 4042 the Morrow's shares based on the appraised value of Prestonwold's real estate. Hugo Colombi, Jr. stated that he wished to consider the Morrows' proposals. No further negotiations were held.
The Morrows brought this action for the involuntary dissolution of Prestonwold pursuant to General Statutes § 33-896.[8] Section 33-896
(a) provides in part the following: "The superior court for the judicial district where the corporation's principal office or, if none in this state, its registered office, is located may dissolve a corporation: (1) In a proceeding by a shareholder if it is established that: (A) The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent; or (B) the corporate assets are being misapplied or wasted." The Morrows focus solely on the claim that the conduct of those in control of Prestonwold has been "oppressive."
Although the legislature in adopting § 33-896 as part of the Connecticut Business Corporation Act has directed that the court look to the Model Business Corporation Act and its commentary for guidance when interpreting Connecticut law,[9] the model act and its commentary do not provide a definition of the word "oppressive."
Other trial courts in Connecticut have relied on New York law[10] to determine if the conduct complained of is oppressive. Devivo v. Devivo, Superior Court, judicial district of Hartford at Hartford, Docket No. 581020 (May 8, 2001, Satter, J.T.R.) (30 Conn.L.Rptr. 52, 54);[11]Stone v. R.E.A.L. Health. P.C., Superior Court, judicial district of New Haven at New Haven, Docket No. 414972 (November 15, 2000, Munro, J.) (29 Conn.L.Rptr. 219, 225).[12]
In determining the contours of oppressive conduct, the New York Court of Appeals examined the nature of a closely held corporation which the drafters of the Model Business Corporation Act obviously considered when fashioning the remedy of involuntary dissolution of a corporation by minority stockholders. Those considerations are worthwhile repeating in this decision.
"It is widely understood that, in addition, to supplying capital to a contemplated or ongoing enterprise and expecting a fair and equal return, parties comprising the ownership of a close corporation may expect to be actively involved in its management and operation. The small ownership cluster seeks to "contribute their capital, skills, experience and labor' toward the corporate enterprise.
"As a leading commentator in the field has observed: "Unlike the typical shareholder in a publicly held corporation, who may be simply an CT Page 4043 investor or a speculator and cares nothing for the responsibilities of management, the shareholder in a close corporation is a co-owner of the business and wants the privileges and powers that go with ownership. His participation in that particular corporation is often his principal or sole source of income. As a matter of fact, providing employment for himself may have been the principal reason why he participated in organizing the corporation. He may or may not anticipate an ultimate profit from the sale of his interest, but he normally draws very little from the corporation as dividends. In his capacity as an officer or employee of the corporation, he looks to his salary for the principal return on his capital investment, because earnings of a close corporation, as is well known, are distributed in major part in salaries, bonuses and retirement benefits.' (O'Neal, Close Corporations [2d ed.], § 1.07, at pp. 21-22 [n. omitted].)
"Shareholders enjoy flexibility in memorializing these expectations through agreements setting forth each party's rights and obligations in corporate governance (see, generally, Kessler, Shareholder-Managed Close Corporation Under the New York Business Corporation Law, 43 Fordham L.Rev. 197, Davidian, op. Cit., 56 St. John's L.Rev. 24, 29-30, and nn. 21-22). In the absence of such an agreement, however, ultimate decision-making power respecting corporate policy will be reposed in the holders of a majority interest in the corporation (see, e.g., Business Corporation Law, §§ 614, 708). A wielding of this power by any group controlling a corporation may serve to destroy a stockholder's vital interests and expectations.
"As the stock of closely held corporations generally is not readily salable, a minority shareholder at odds with management policies may be without either a voice in protecting his or her interests or any reasonable means of withdrawing his or her investment. This predicament may fairly be considered the legislative concern underlying the provision at issue in this case; inclusion of the criteria that the corporation's stock not be traded on securities markets and that the complaining shareholder be subject to oppressive actions supports this conclusion." (Internal citations and quotation marks omitted in part) Matter of Kempand Beatley. Inc., 64 N.Y.2d 63, 72-73, 473 N.E.2d 1173 (1984).
The New York Court of Appeal concluded that to determine whether the conduct of the majority is oppressive, it should adopt the "reasonable expectation" test. "Given the nature of close corporations and the remedial purpose of the statute, this court holds that utilizing a complaining shareholder's "reasonable expectations' as a means of identifying and measuring conduct alleged to be oppressive is appropriate. A court considering a petition alleging oppressive conduct must investigate what the majority shareholders knew, or should have CT Page 4044 known, to be the petitioner's expectations in entering the particular enterprise. Majority conduct should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture are not fulfilled. Disappointment alone should not necessarily be equated with oppression. Rather, oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture." Matter of Kempand Beatley. Inc., supra, 64 N.Y.2d at 73.
"[T]he question of what is "oppressive' conduct by those in control of a "close' corporation as its majority stockholders is closely related to what we agree to be the fiduciary duty of a good faith and fair dealing owed by them to its minority stockholders." Baker v. Commercial BodyBuilders, Or., 507 P.2d 387, 394 (1973).
In applying the reasonable expectation test in the present case, the Colombis would have this court believe that it should look to the reasonable expectations of Hugo Colombi, Sr. and those expectations are that the land be held primarily for recreational use by the family. Although that may have been Hugo Colombi Sr.'s reasonable expectation, that is not the lens to be used under the corporate dissolution statute. Rather it is what the majority knew or should have known to be the reasonable expectations of the Morrows when they received their inheritance of the stock in Prestonwold in 1975. It is clear to the court that those reasonable expectations where economic gain and the participation in the management of the corporation and not to hold the land for the pleasure of the Colombis.
In the present case, the Morrows have an investment in Prestonwold in the amount ranging from $231,225 to $277,590 (46.265% of $500,000 to $600,000) and they currently receive no meaningful cash return. The Colombis, however, argue that during the 1990s there were cash distributions[13] to the stockholders, to wit: a total of $ 18,000 in 1994; a total of $9,500 in 1996 and a total of $8,500 in 1999.[14]
There are two problems with this argument. First, the 1996 and 1999 distributions were to cover the stockholder's personal tax liabilities with respect to the corporation which elected to be taxed as an S chapter corporation. Second, the 1994 total distribution of $18,000 to all stockholders on a pro rata basis, which represents the only cash return to the stockholders for the period of 1993 through the date of trial of this matter, a period of approximately nine years, is not a reasonable return on an asset which has a value of approximately $550,000. This return amounts to approximately one-third of one percent per annum over the nine year period. Furthermore, even if all the distributions totaling $45,000 over the nine year period, including the two distributions for CT Page 4045 the purposes of tax liability and the forgiveness of the debts (see footnote 13), were to be considered, the return to stockholders would amount to eight-tenths of one percent per annum. This certainly is not a reasonable return. Although the stockholders may hope that the value of the land will increase, the bottom line is that you can't eat land. The court finds that the failure to pursue a sale of the land in accordance with the unanimous vote of the stockholders in 1995 constitutes oppressive conduct within the meaning of § 33-896 (a).
Furthermore, it was the reasonable expectation of the Morrows that a member of the Morrow family continue in the active management as an officer of Prestonwold as Madeline Morrow had done since 1978 until she decided not to seek office in 1992. Catherine Morrow, Madeline's daughter, sought a position as an officer or an assistant in 1999 and offered to serve without compensation. Despite her impressive credentials[15] and her offer to serve without compensation, the Colombis made it clear that they would not accept her.
Even if the court should employ the following alternative standard for defining "oppressive conduct", the Morrows would still be entitled to the relief they seek. "The second definition is derived from British law, and describes "oppressive conduct' as burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely. (Baker v. Commercial Body Builders. Inc., 264 Or. 614, 628-629,507 P.2d 387; comment, 1965 Duke LJ 128, 134, quoting Scottish Co-opWholesale Soc'y. Ltd. v. Meyer [1958], 3 All E.R. 66, 71 86 [HL] andElder v. Elder and Watson. Ltd. [1952], Sess Cas, 49, 55, construing The Companies Act of 1948, 11 12 Geo, 6, ch. 38 § 320.)
"This definition, too, has found support in New York cases. (Matter ofBeshar, N.Y.L.J., Feb. 18, 1981, p. 6, col. 1.) In Mardikos v. Arger,116 Misc.2d 1028, 457 N.Y.S.2d 371, this approach was summarized by defining `oppression' as `conduct which fair-minded people would find objectionable.' (Mardikos v. Arger, supra, p. 1031, 457 N.Y.S.2d 371.)"Gimpel v. Bolstein, 125 Misc.2d 45, 477 N.Y. Sup.2d 1014, 1018 (1984).
Since 1993, Hugo Colombi, Jr. failed to respond to requests for information about the corporation and its finances from the Morrows. The Morrows sought a special meeting of the Board of Directors on December 11, 1999. Prior to that meeting, Catherine Morrow in her capacity as Director of Prestonwold sought certain information from Hugo Columbi as President which was very relevant with respect to her duties as a director.[16] With respect to the material that was available, Hugo CT Page 4046 Columbi, Jr.'s answer was simple[17] — no information would be given and he claimed it could not be given to her as an individual director.[18] Furthermore, the Colombis responded by voting at that special meeting to amend the by-laws to provide that a special meeting of the Board of Directors could only be called by the President, or upon request of three directors which would make it impossible to call a special meeting over the objection of the Colombis.[19]
Particularly disturbing is the Colombis' self-dealing with respect to the rental of the "Brown" cottage to Hugo Colombi, Jr. It is clear that "[a]n officer and director occupies a fiduciary relationship to the corporation and its stockholders. Arrigoni v. Adorno, 129 Conn. 673,681, 31 A.2d 32. He occupies a position of the highest trust and therefore he is bound to use the utmost good faith and fair dealing in all his relationships with the corporation. General Statutes § 33-323;Osborne v. Locke Steel Chain Co., 153 Conn. 527, 534, 218 A.2d 526;Massoth v. Central Bus Corporation, 104 Conn. 683, 689, 134 A. 236;Mallory v. Mallory Wheeler Co., 61 Conn. 131, 139, 23 A. 708; see Cross, Corporation Law in Connecticut § 6.8; 3 Fletcher, Private Corporations (Perm. Ed. Rev. 1975) §§ 838, 850" Katz Corporation v.T.H. Canty Co., 168 Conn. 201, 207 (1975). Hugo Colombi, Jr.'s use of the corporate property as if it was his own constitutes a breach of a fiduciary duty owed to the corporation and its stockholders. When he finally commenced paying rent (after occupying it rent free for 17 years) at the rate of $300 per month at the insistence of the Morrows in 1992, then raising to $350 per month and finally $600 per month, there was never any showing by Hugo Colombi, Jr. that these rents represented the market rate.[20] "[A] director has the burden of showing that any personal dealing with the corporation is fair, in good faith, and for adequate consideration." Id. Simply put, it constituted self-dealing on the part of Hugo Colombi, Jr.
Finally, the arrogance of Hugo Colombi, was mirrored at the May 2000 stockholder meeting. Douglas S. Skalka, the attorney representing the defendant attended under Cheryl Morrow's proxy. Hugo Colombi opened the meeting and immediately adjourned the meeting acting under advice of counsel. The stockholders meeting was not rescheduled depriving all the stockholders an opportunity to participate as shareholders in this corporation.
When the conduct of the Colombis, in particular Hugo Colombi, Jr., is taken into account — that is, the failure to disseminate information to stockholders and directors, the failure to conduct corporate affairs in a fair manner, the threats of breaching the dam in response to a notice of violation issued by the Department of Environmental Protection[21] which could result in penalties from that CT Page 4047 state agency, the failure to advise the directors and stockholders of the dam problem in a timely fashion and the self-dealing with respect to the rental of the "Brown" cottage — it constitutes oppressive conduct. Indeed, when the conduct is viewed in the context that the Morrows get virtually no return on their investment in Prestonwold, it becomes overwhelmingly oppressive.
Although proceeding under the involuntary dissolution statute, it is nevertheless an equitable proceeding. In re Lalaland DevelopmentCorporation, 152 N.W.2d 758, 765 (Minn.) (1967). This court is not unmindful of the equitable principle it should only grant "the drastic remedy of dissolution with great caution and not in doubtful cases. It is fundamental that a receiver shall be interposed to conserve and not to destroy." Id.
The statutory scheme for judicial dissolution also provides that the court may appoint a custodian, General Statute, § 33-898 (a); and subsequently may redesignate the custodian as a receiver. General Statute § 33-898 (d). Under the circumstances of this case, because of the pending problem with the Department of Environmental Protection with respect to the dam, (see footnote 19), the court is of the opinion that it would be in the best interests of the corporation and its stockholders at this time to designate a custodian for Prestonwold.
The custodian shall exercise all the powers of the board of directors and officers of Prestonwold to the extent necessary to manage the affairs of the corporation in the best interests of its stockholders. General Statutes, § 33-898 (d). The custodian will also be directed to (1) investigate the complaints of the Department of Environmental Protection; (2) make recommendations to the court as to the manner of disposing of the land, either in bulk sale or otherwise, that would maximize the return to the stockholders; and (3) make any other recommendations to the court that will be in the best interests of Prestonwold.
The court suggested that counsel for both parties make a joint recommendation of an attorney that should be appointed custodian, without prejudice to either or both parties' right to appeal this decision to an appellate court. With that reservation, both the plaintiffs and the defendant have recommended the appointment of James Young, Esq. of the law firm of Andrews, Young Geraghty, P.C. of New London, Connecticut and court accordingly appoints Attorney Young as custodian. Attorney Young is directed not to take any action nor incur any expense as custodian until the time in which to appeal this decision to the Appellate Court pursuant to Chapter 63 of Connecticut Practice Book has expired. CT Page 4048
The undersigned judge will retain jurisdiction over this file.
_____________________________________ Robert I. Berdon, Judge Trial Referee