OPINION OF THE COURT
Arthur W. Lonschein, J.
Robert Gimpel is a shareholder in Gimpel Farms, Inc. Believing himself oppressed by the conduct of his fellow shareholders, he has brought a petition to dissolve the corporation pursuant to section 1104-a of the Business Corporation Law and a derivative action pursuant to section 626 of the Business Corporation Law. The corporation and his fellow shareholders move to consolidate and dismiss both suits for failure to state a cause of action. Both sides have, however, urged the court to treat the motion to dismiss as one for summary judgment, and have submitted extensive affidavits as to the underlying facts. The court, therefore, will treat this as a motion for summary judgment.
The essential facts may be simply stated:
Gimpel Farms is a family corporation engaged in the dairy business. It was founded in 1931 by Louis Gimpel, and control has now passed through his heirs of the second generation (his son and Robert’s father, David Gimpel, and his son-in-law, Moe Bolstein) to his heirs of the third generation (Robert, his brother George, and his cousin Diane Bolstein Kaufman). David Gimpel died in 1980, leaving his voting stock to Robert and George and his nonvoting stock to his wife Shirley. Moe Bolstein is still alive, but has sold all of his shares to his daughter Diane.
The family members have always participated actively in the management and daily operations of the company and have taken their recompense in the form of salary and perquisites. Moe Bolstein continues to be employed by the corporation as an officer and executive, and draws a substantial salary, although the amount of work he actually does is in dispute. Diane Kaufman’s husband, Charles, and George Gimpel also are employed by the corporation in *48 executive capacities and draw substantial salaries. It appears that no dividends have ever been paid.
Robert owns his stock by gift and bequest from his father.[1] He was employed by the company in an important and sensitive managerial position until 1974, when he was discharged due to allegations that he had embezzled some $85,000. The defendants put forth substantial evidence to support these allegations. Robert rebuts them with a form of artful evasion properly characterized as a “non-denial denial”,[2] that is, he never actually states that he did not embezzle the funds. He says, instead, that he was never prosecuted for any crime and that the Statute of Limitations for such a prosecution has passed. Further, as he delicately phrases it, his father “adjusted any disputed financial transaction”. This is insufficient to controvert the point, and for the purposes of this motion the court deems it established that in 1975 Robert was, in fact, a thief, that he stole from the family company, and was discharged from all company employment when his theft became known.
Since that time, Robert has received no benefits from his ownership position with this obviously profitable company. The company has continued to adhere to its policy of not paying dividends and, while the other shareholders have received substantial sums as salary, benefits and perquisites, Robert has received not a penny.[3] Not surprisingly, he has also been excluded from all managerial decisions (there have been no formal shareholders’ meetings) and has received the barest minimum of information concerning company affairs. The only opportunity Robert has had to gain from his interest came in 1980, when, after his father’s death, the other shareholders offered to buy out his shares at a figure which he rejected as inadequate.
*49 THE PETITION FOR DISSOLUTION
The court has the power to order the dissolution of a corporation where “[t]he directors or those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders” (Business Corporation Law, § 1104-a, subd [a], par [1]) or where “the property or assets of the corporation are being looted, wasted or diverted for non-corporate purposes by its directors, officers or those in control.” (Business Corporation Law, § 1104-a, subd [a], par [2].) Dissolution under this section is discretionary. (Matter of Topper v Park Sheraton Pharmacy, 107 Misc 2d 25, 28.) It is a “drastic” remedy, and before ordering it the court must consider whether it is the only means by which the complaining shareholders can reasonably expect to receive a fair return on their investment or whether it is reasonably necessary to protect their rights and interests. (Business Corporation Law, § 1104-a, subd [b]; Muller v Silverstein, 92 AD2d 455.) The corporation or any of its shareholders may avoid the proceeding by electing to purchase the petitioner’s shares at their fair value. (Business Corporation Law, § 1118.)
Here, Robert has alleged both “oppressive” actions under section 1104-a (subd [a], par [1]) of the Business Corporation Law and waste and diversion of corporate assets under section 1104-a (subd [a], par [2]) of the Business Corporation Law. None of the respondents has elected to purchase his shares although the time in which they may do so as a matter of right has expired[4] (Business Corporation Law, § 1118, subd [a]) and so the court must determine whether the statutory standards for dissolution have been met.
Robert alleges numerous acts by the majority which he claims constitute “oppressive” conduct. Stripped of the *50 legal interpretations and conclusory language with which they are presented, the allegations fall into three categories: (1) He has been excluded from “corporate participation”; (2) The profits of the corporation are distributed to the majority interests in the form of salaries, benefits and perquisites, with no dividends being declared; whereby Robert derives no benefit whatsoever from his ownership interest; and (3) He has been excluded from examination of the corporate books and records which he is entitled to examine, completing his “freeze-out” from the corporation. Robert expressly disclaims, as well he should, any claim that his dismissal in 1975 constituted “oppression” in any sense. Clearly, it was proper to dismiss a thief. Yet, he claims that his continued exclusion from “corporate participation” does constitute oppression.
The first question presented is whether the conduct of the majority can be said to be “oppressive” within the meaning of section 1104-a of the Business Corporation Law. The term is not defined within the statute. Two definitions have gained currency in New York and in the numerous reported decisions across the country construing similar statutes.[5]
The most prominent of these stems from the writings of F. Hodge O’Neal, and defines “oppression” as a violation by the majority of the “reasonable expectations” of the majority. This definition has been accepted by the leading New York cases dealing with “oppression,” Topper v Park Sheraton Pharmacy (107 Misc 2d 25, supra), and Matter of Barry One Hour Photo Process (111 Misc 2d 559).
The second definition is derived from British law, and describes “oppressive conduct” as “ ‘burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to *51 rely.’ ” (Baker v Commercial Body Bldrs., 264 Ore 614, 628-629; comment, 1965 Duke LJ 128, 134, quoting Scottish Co-op Wholesale Soc. v Meyer [1958], 3 All ER 66, 71, 86 [HL]; and Elder v Elder & Watson [1952], Sess Cas, 49, 55, construing The Companies Act of 1948,11 & 12 Geo VI, ch 38, § 210.)
This definition, too, has found support in New York cases. (Matter of Beshar, NYLJ, Feb. 18,1981, p 6, col 1.) In Mardikos v Arger (116 Misc 2d 1028), this approach was summarized by defining “oppression” as “conduct which fair-minded people would find objectionable”. (Mardikos v Arger, supra, p 1031.)
These two approaches are, of course, not mutually exclusive, and will frequently be found to be equivalent. Often, however, it will be found that one or the other lends itself more nearly to the facts of the case as an appropriate analytical framework.
Here, the “reasonable expectations” test seems to be inappropriate, given the corporation’s advanced stage of existence and the plaintiff’s place and record. It is frequently said that the relationship between the founders of a close corporation approximates that between partners (Topper v Park Sheraton Pharmacy, 107 Misc 2d 25, 32, supra; Matter of Barry One Hour Photo Process, 111 Misc 2d 559, 564, supra; Matter of Gordon & Weiss, 32 AD2d 279), and the “reasonable expectations” test is indeed an examination into the spoken and unspoken understanding upon which the founders relied when entering into the venture. Here, however, we have a corporation in its fifty-third year of existence. The sole founder, Louis, transferred ownership and control to his son and son-in-law (David and Moe) many years ago, and they ran the business as essentially equal partners until the death of David in 1980. To the extent that Louis adopted the corporate form in cooperation with David and Moe in order to facilitate their takeover of the business, the “reasonable expectations” test could be said to apply to the relationship between them. However, David is dead, and his sons now own his voting shares. Moe’s shares, voting and nonvoting, have all been sold to his daughter.
*52 Thus, all present holders of the voting shares of the corporation are two generations removed from the adoption of the corporate form. While the manner of their dealing with each other may in some respects resemble that of partners, it cannot fairly be said that they entered into the business with the same “reasonable expectations” as partners do. Since they all acquired their shares by bequest or gift from other parties, they in no sense chose each other as business associates. The original participants in a close corporation enter into their agreement on the basis of the assessments of each other’s talents, assets, intentions and characters and their agreement must, therefore, be regarded as personal in nature. Unless there is an unmistakable expression of their intent to the contrary, the agreement will not “run with the shares.”[6] Hence, the present shareholders are not bound by whatever unwritten agreements may have existed between Louis, David and Moe,[7] and did not form any agreement among themselves which could inure to Robert’s benefit.
Also, it must be recognized that “reasonable expectations” do not run only one way. To the extent that Robert may have entertained “reasonable expectations” of profit in 1975, the other shareholders also entertained “reasonable expectations” of fidelity and honesty from him. All such expectations were shattered when Robert stole from the corporation. His own acts broke all bargains. (See Exadaktilos v Cinnaminson Realty Co., 167 NJ Super 141, affd on opn below 173 NJ Super 559, 414 A2d 994.) Since then, the only expectations he could reasonably entertain were those of a discovered thief: ostracism and prosecution. To the extent that the majority has refrained from prosecuting him, they have dealt with him more kindly than he had reason to expect, not less.
*53 Even though Robert may not lay claim to the reasonable expectation of any specific benefits, it does not necessarily follow that the majority shareholders may treat him as shabbily as they please. Where the question of oppressiveness cannot be resolved by comparing the conduct of the majority to the “reasonable expectations” of the parties, the court must look to the alternative test described above, and consider whether that conduct was inherently oppressive. Although a minority shareholder may be in the position of a stranger to them, the majority must still act with “probity and fair dealing,” and if their conduct becomes “burdensome, harsh and wrongful,” they may be found to have been guilty of oppression and the corporation may be subject to dissolution.
Under this test, Robert’s discharge, as well as his subsequent exclusion from corporate management, were not oppressive. It was clearly not wrongful for the corporate victim of a theft to exclude the thief from the councils of power. The salient point here, which sharply distinguishes this case from Topper (107 Misc 2d 25, supra), Barry (111 Misc 2d 559, supra) and Beshar (NYU, Feb. 18, 1981, p 6, col 1, supra), is that the petitioner himself was the initial wrongdoer. Thus, the only forms of participation which may fairly be said to be open to Robert are those open to a shareholder in the position of a stranger:[8] possible entitlement to dividends, voting at shareholders’ meetings, and access to corporate records. (Business Corporation Law, § 624.) Robert has received none of these.
Turning first to the failure to declare dividends, it seems that from the beginning of the corporation until Robert’s fall from favor in 1975, the corporation had declared no dividends, apparently by consent of all shareholders, but in any event without objection from anyone. All concerned received all income from the corporation in the form of salary for their corporate positions. This policy was basic to the financial structure of the business. This can be seen by *54 the fact that a second class of stock was created to facilitate estate planning by the major stockholders, Robert’s father David, and Uncle Moe. This class B stock had no voting rights but was equivalent to class A stock in all other respects. It was intended that upon the death of David or Moe the bulk of this class B stock would be inherited by their wives, and the corporation would begin to buy these shares back to pay for funeral and estate expenses and taxes, and to provide funds to the widows. The corporation has, in fact, already repurchased about half of the class B stock inherited by Robert’s mother Shirley. Clearly, if the corporation were to begin to pay dividends now, the owner of the remaining shares would receive a disproportionate share of income. This was clearly against the original intent of the shareholders, and demonstrates their reliance upon a no-dividend policy. The policy was firmly established when the present majority came into control of the corporation.
Robert’s claim that it was wrongful for them to continue that policy after his discharge amounts to an assertion that they were bound to change the basic structure of the business for his sole benefit and to their detriment. This assertion cannot stand.[9]
As to his other allegations of oppression, the failures to hold shareholders’ meetings, to issue proper stock certificates reflecting his actual interest in the corporation, or to allow him access to stock ledgers may all have been improper, but do not, individually or collectively, constitute oppressive conduct such as would justify dissolution.
Robert also asks for dissolution under section 1104-a (subd [a], par [2]) of the Business Corporation Law which allows such relief when “[t]he property or assets of the corporation are being looted, wasted, or diverted from non-corporate purposes by its directors, officers or those in control of the corporation.” The major allegation in support *55 of this charge is that the salaries of the majority shareholders, in particular that of Moe Bolstein, who is now a former shareholder, have been excessive. It is also alleged that the corporate books have been “manipulated” so as to “affect the net income” of the corporation. In the particular circumstances of this case, these allegations, even if true, would not justify dissolution of the corporation. Robert’s derivative action, wherein these same allegations are made, provides a sufficient remedy for any wrong that may have been done by these acts, as discussed below. Therefore, since dissolution is not “reasonably necessary for the protection of the rights and interests of any substantial number of shareholders or of the petitioners” (Business Corporation Law, § 1104-a, subd [b], par [2]), it will not be ordered on these grounds, either.[10]
Having considered and rejected dissolution of the corporation, the court is nonetheless constrained to recognize that Robert cannot be forever compelled to remain an outcast. Even Cain was granted protection from the perpetual vengefulness of his fellow man. (Genesis 4:12-15.) While his past misdeeds provided sufficient justification for the majority’s acts to date, there is a limit to what he can be forced to bear, and that limit has been reached. The other shareholders need not allow him to return to employment with the corporation, but they must by some means allow him to share in the profits.
The court is not without jurisdiction to fashion a remedy here. While the statute itself makes explicit mention of only one remedy, that being liquidation, the court is also charged to consider whether that is the only means available to protect the rights of the petitioning shareholder. (Business Corporation Law, § 1104-a, subd [a], par [2].) Clearly, this gives the court discretion in a proper case, to fashion an appropriate remedy. This discretion was recognized in Muller v Silverstein (92 AD2d 455, supra) where the Appellate Division reversed an order of dissolution on procedural grounds, but also observed that, since the alleged oppressive conduct consisted of failure to declare *56 dividends, the trial court could have ordered the corporation to declare a dividend. A number of States have recognized a panoply of alternative remedies, to which a court may turn where relief is warranted, short of dissolution.[11]
To begin with, the corporation must immediately allow Robert full access to corporate records, as is more fully set out below with regard to the derivative action. If the administration of David Gimpel’s estate has progressed to the point where stock certificates may properly be issued to Robert under David’s will, this must be done promptly.
Most importantly, the majority must make an election: they must either alter the corporate financial structure so as to commence payment of dividends, or else make a reasonable offer to buy out Robert’s interest. The election must be made within six months of the order to be entered hereon, and must be made known at a shareholders’ meeting within that time.
If the corporation chooses to commence payment of dividends, the dividends must be substantial (consistent with sound business judgment) and not a sham. To the extent *57 that the salaries paid to majority shareholders have been fixed so as to include amounts in lieu of dividends, the salaries must be adjusted downward. As to the relative rights of the different classes of stock, the Amended Certificate of Incorporation expressly states that they are to share equally in any dividends. The court neither directs nor prohibits any change in the structure of the classes of stock, but if any changes are made, they must be made in good faith, for a legitimate business purpose, and not for the purpose of weakening Robert’s position.
If the election is made to buy out Robert’s shares, the offer again must be substantial and made in good faith. The court does not now render any opinion on the method to be used in determining the reasonableness of the offer either as to whether or not the existence of the class B shares is to be taken into account or as to the proper method for arriving at a per-share valuation. (But see Matter of Taines v Barry One Hour Photo Process, 123 Misc 2d 529.) The court’s order herein will be phrased as a mandatory injunction, with dissolution being one of the remedies for contempt. (See Patton v Nicholas, 154 Tex 385.)
THE DERIVATIVE ACTION
In addition to the allegations of excess salaries and manipulation of books noted above, Robert’s derivative action also contains a second cause of action related to his alleged exclusion from access to corporate books and records. Treating this second cause of action first, the court notes that a shareholder has an absolute right to inspection of annual balance sheets and profit and loss statements, limited only by the procedural requirements of subdivision (e) of section 624 of the Business Corporation Law. Further, in the absence of bad faith, a shareholder has a statutory right to examination of shareholder records (Business Corporation Law, § 624, subds [b], [c]) and a common-law right to examine the corporate books of account. (Matter of RDR Assoc. v Media Corp. of Amer., 63 AD2d 888.) The burden is on the corporation to show bad faith. CMatter of Lewis uJ&K Plumbing & Heating Co., 71 AD2d 708.) Where, as here, the shareholder has been denied full access to the corporate books for several years, *58 does not operate a competing business, and seeks only to enforce his personal rights as a shareholder, there is no bad faith. (O’Brien v O’Brien, 75 AD2d 641.) Hence, the corporation will be directed to allow Robert full access to all corporate financial, shareholder, and account books.
With regard to the allegations of waste and mismanagement, the scope of judicial review is limited. The judgment of the directors of the corporation is to be interfered with only when clear abuse, bad faith or fraud are shown. (Sanfield v Goldstein, 33 AD2d 376.) Further, the court has already ruled, in relation to the petition for dissolution, that it was not wrongful for the majority shareholders to continue the policy of distributing profits in the form of salaries, benefits and perquisites, without declaring dividends. This ruling is applicable to the derivative action as well. To the extent that the complaint alleges salaries which are excessive even in view of the above, however, substantial factual issues are presented and summary judgment is inappropriate at this time.
For the reasons stated above, therefore, the court grants summary judgment to the petitioner on the petition for dissolution only to the extent that an injunction will issue governing the future conduct of the corporation. As to the derivative action, the motion for summary judgment is denied as to the first cause of action, the second cause of action is severed, and the motion for summary judgment is granted as to the second cause of action in favor of the plaintiff to the extent indicated. The motion to consolidate is denied.

. The exact amount of stock Robert owns is a matter of dispute, which the court need not resolve at this time. He was given one share of class A (voting) stock and 10 shares of class B (nonvoting) stock in 1971 and held them until at least 1974. His brother George claims to have bought the shares at that time, although Robert disputes this. Robert definitely became the beneficial owner of 20 shares of class A stock under the will of his father. For the purposes of this decision, the court has accepted the correctness of Robert’s assertion that he was a shareholder-at all times relevant to the complaint. (See n 8, infra.) The corporation expressly disclaims any objection to Robert’s standing under section 1104-a of the Business Corporation Law.

. See Woodward and Bernstein,'All the President’s Men, passim.

. For some reason not revealed by the record, Robert was allowed the use of a company car from 1980 to 1982, but this also ended badly and acrimoniously.

. Respondents in an 1104-a proceeding may frequently be reluctant to commit themselves to purchase a petitioner’s shares without knowing the price in advance, and so may be tempted to delay electing to do so, in the hope that the court will rule in their favor on the necessity for dissolution. By adopting this strategy, they take the risk that the court will exercise its discretion to deny them the right to make the election after it has ordered the dissolution. In the usual case, since the petitioner is entitled to recover only the fair value of his shares through dissolution, the sound exercise of discretion would seem to dictate that the respondents be allowed to purchase his shares for that same fair value at any stage of the proceeding before dissolution has actually begun. This may not always be the case, however, and so the strategy is not without risk. (See Davidian, Corporate Dissolution in New York: Liberalizing the Rights of Minority Shareholders, 56 St. John’s L Rev 24, 46-47.)

. For a collection of such statutes, see the opinion of Mr. Justice Ryp in Topper v Park Sheraton Pharmacy (107 Misc 2d 25, 31, supra). Significant cases in this area include: Stumpf v Stumpf & Sons (47 Cal App 3d 230); Exadaktilos v Cinnaminson Realty Co. (167 NJ Super 141, affd on opn below 173 NJ Super 559); Gidwitz v Lanzit Corrugated Box Co. (20 111 2d 208); Fix v Fix Material Co. (538 SW2d 351 [Mo, 1976]); Masinter v Webco Co. (262 SE2d 433 [W Va, 1980]); Baker v Commercial Body Bldrs. (264 Ore 614).

. Even if an original participant had had a reasonable expectation of personal employment, after his death the surviving shareholders would not be bound to employ any dolt who happened to inherit his stock.

. Robert contends that the class B shares should be ignored in evaluating his interest, since Louis, David and Moe had intended that control of the corporation would be maintained equally between the Gimpel and Bolstein branches of the family. In fact, he cites Moe’s denial of the existence of that understanding as an oppressive act. It must be noted that if Robert succeeds in compelling the corporation to purchase his shares as the price of survival, voting control will pass decisively to the Bolstein branch of the family, destroying whatever remains of any such understanding.

. If the court were to determine the issue of the alleged 1974 stock sale (n 1, supra) adversely to Robert, this point would become even stronger. Robert would then be seen as a nonshareholder at the time of his discharge, and would have no reason to complain about his exclusion from all forms of corporate participation from then until the death of his father. His reentry into shareholder status at that time would render his position even closer to that of a total stranger.

. Matter of Gardstein (99 AD2d 445), cited by Robert, is not supportive of his position. There, the majority had changed the dividend policy when the petitioner left, which was found to be oppressive. Here, there was no change in policy. Compare Erdman v Yolles (62 Mich App 594) where there had also been a no-dividend policy. After the plaintiff left, the remaining shareholders liquidated substantial assets in order to provide themselves with additional salaries and bonuses. The court there ordered pro rata distribution to be made to the plaintiff.

, The court need not, therefore, reach the question of whether to order compliance with the notice procedures of section 1106 of the Business Corporation Law.

. The following list was set forth in Baker v Commercial Body Bldrs. (264 Ore 614, supra) and cited with approval in Fix v Fix Material Co. (538 SW2d 351 |Mo], supra) and Masinter v Webco Co. (262 SE2d 433 [W Val, supra):
(a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;
(b) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until differences are resolved or “oppressive” conduct ceases;
(c) The appointment of a “special fiscal agent” to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;
(d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or “special fiscal agent”;
(e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;
(f) The issuance of an injunction to prohibit continuing acts of “oppressive” conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;
(g) The ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital;
(h) The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;
(i) The ordering of affirmative relief by the entry of an order permitting minority stockholders to purchase additional stock under conditions specified by the court;
(j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result of “oppressive” conduct by the majority in control of the corporation.