[No. 48722-1-I.   Division One.   January 6, 2003.]

MARTY NOBLE, *Appellant*, v. RENATO LUBRIN, ET AL., *Respondents*.

*Paul R. Lehto*, for appellant.

*Bruce E. Jones* (of *Newton & Kight, L.L.P.*), for respondents.

AGID, J. — Martin Noble appeals from a bench trial verdict involving the formation, operation, and dissolution of Evergreen Promotions, Inc., a corporation that he formed with Renato Lubrin. Noble assigns error to virtually all of the trial court's findings and conclusions, arguing (1) that Lubrin wrongfully appropriated a corporate opportunity or (2) breached a fiduciary duty by engaging in oppressive conduct; (3) that Lubrin's company, Sky Valley Productions (Sky Valley), was a successor corporation; and (4) Noble should have received an attorney fees award. He also asserts that (5) the findings do not support the court's order judicially dissolving the corporation and (6), the trial court was required to make findings about the monetary and nonmonetary advantages Lubrin obtained by his actions. Lubrin cross-appeals, contending the trial court erred in ordering the sale of assets and an accounting and not awarding his attorney fees. We affirm the trial court's decision because there was no corporate opportunity for

Lubrin to take and his actions did not constitute oppressive conduct. There is also substantial evidence supporting the finding that Sky Valley is not a successor corporation. The court properly ordered dissolution and an accounting because the corporation had ceased all activity and not distributed its assets at the time of trial. Nor did the court need to make findings about advantages Lubrin obtained because it correctly found that he did not breach a fiduciary duty. Finally, there is no basis for awarding attorney fees to either party.

## FACTS

Noble and Lubrin formed Evergreen Promotions, Inc., (Evergreen) in March 1998. The closely-held corporation was formed to put on swap meets at Snohomish County's Evergreen Fairgrounds[1] (the fairgrounds) in Monroe. Noble was vice-president and a 60 percent shareholder, Lubrin was president and a 40 percent shareholder, and both were directors of the corporation. Lubrin had prior business experience and good contacts at the fairgrounds where he had worked for 22 years. Noble had management experience and his wife, Nancy Noble, provided professional services in advertising placement and media services. Vicki Lubrin, Lubrin's wife, provided bookkeeping services for the company.

Evergreen entered into two one-year leases with the fairgrounds, one for swap meets and the second for a Christmas fair. Neither contract had a renewal option. Evergreen also got some three-year sponsorships paid in advance by area businesses wishing to have their names displayed at the Christmas fair. Throughout the first year, the parties held swap meets and the Christmas fair. They purchased lights and related equipment for the Christmas fair's "one million lights" display. At the end of the year, the parties met to plan for the next year.

---

[1] Evergreen Fairgrounds is not related to Evergreen Promotions, Inc.

Several weeks after the meeting, Lubrin met with Noble and offered him $19,323.89 to terminate the agreements between them and let Lubrin retain Noble's stock and all assets of the corporation. The $19,323.89 figure represented the amount of Noble's loans to Evergreen without interest minus corporate debts that Noble had not paid. Noble did not accept the offer at the meeting; instead, he sent a letter stating that he would accept that amount plus his $4,000 investment. Lubrin declined.

The parties then began communicating only through their attorneys. They did not give notice of or hold a shareholder or director's meeting to dissolve Evergreen.[2] The corporation's only assets were Christmas lights and swap meet equipment that they had divided for storage.[3] By March 1999, Evergreen had accrued debts of $55,000, and the business had no market value. At that time, Vicki Lubrin returned the renewal of corporate registration with the word "dissolved" written on it based on advice from the secretary of state's office about how to dissolve the corporation. On July 10, 1999, the secretary of state administratively dissolved the corporation because Evergreen had not filed its annual registration.

When Lubrin decided not to continue Evergreen with Noble, he and his wife started a partnership called Sky Valley Productions. Sky Valley entered into license agreements with the fairgrounds to hold swap meets and a Christmas fair in 1999 and 2000. Sky Valley honored the agreements that Evergreen had with local businesses, mentioning their names as promoters because they felt "a personal obligation to [do] so." Sky Valley used the lights Lubrin was storing to present Sky Valley's Christmas fair. In 1999, Sky Valley lost money, and in 2000, it made a profit of $1,500.

---

[2] Chapter 23B.14 RCW, the Washington Business Corporation Act chapter on corporate dissolution, establishes the procedures for dissolving a corporation.

[3] Noble had lights and equipment originally purchased for $32,000, and Lubrin had lights and equipment originally purchased for $8,400. The trial court found their value was insignificant. It noted that "[e]veryone [had] testified that many of the lights would not work in subsequent years."

Noble brought a personal and derivative suit in superior court claiming that Lubrin breached his fiduciary duty as an officer by wrongfully appropriating a corporate opportunity to himself. He also sought injunctive relief ordering Lubrin to account for all expenses and income of the corporation, return all corporate assets he had taken from the corporation, and stop appropriating a corporate opportunity. He also sought damages of more than $90,000 and attorney fees.

The trial court concluded there was no corporate opportunity for Lubrin to usurp, the corporation had no value, and there was no good will. It ordered that the corporation be dissolved and wind up its affairs with an accounting of Evergreen's assets, which should be applied to its debts. The court made a finding that the corporation was not properly dissolved and awarded Noble $175.00 in statutory fees and costs. Finally, the court declined to award attorney fees to either party.

## DISCUSSION

As a preliminary matter, we must determine whether Noble properly assigned error to the findings of fact and conclusions of law. Ordinarily, unchallenged findings of fact are treated as verities on appeal.[4] Lubrin argues that we should apply that rule here because Noble assigned error to only three findings of fact: 1.22, 1.36, and 1.31. But the appellate court may excuse a party's failure to assign error where the briefing makes the nature of the challenge clear and the challenged finding is argued in the text of the brief.[5] In this case, Noble correctly asserts that some conclusions of law were actually labeled findings of fact,

---

[4] *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

[5] RAP 1.2(a); *Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 709-10, 592 P.2d 631 (1979).

and he need not assign error to those conclusions.[6] And, although he did not assign error to all findings of fact that relate to the disputed issue, it is clear in the text of his brief that Noble challenges the court's determination that there was no corporate opportunity. In addition, he assigns error to conclusion of law 2.1, which states that "[d]efendants Lubrin did not wrongfully appropriate a corporate opportunity belonging to Evergreen Promotions, Inc."[7] We conclude Noble has adequately raised the issue of whether the trial court erred in finding that there was no corporate opportunity.

I. Did Lubrin wrongfully appropriate a corporate opportunity?

■ "The corporate opportunity doctrine prohibits directors or officers from appropriating to themselves business opportunities that rightfully belong to the corporation."[8] "Whether a particular business opportunity belongs to the corporation or is personal to an individual depends upon the facts and circumstances of each . . . case."[9] In *Equity Corp. v. Milton*,[10] the Delaware Chancery Court defined the corporate opportunity doctrine as follows:

> [W]hen there is presented to a corporate officer a business opportunity which the corporation is financially able to undertake, and which, by its nature, falls into the line of the corporation's business and is of practical advantage to it, or is an opportunity in which the corporation has an actual or expectant interest, the officer is prohibited from permitting his

---

[6] For example, finding of fact 1.32 includes the court's conclusion of law that the license agreements with the fairgrounds did not constitute a corporate opportunity.

[7] Noble also raises the issue in the section of his brief addressing "Issues Pertaining to Assignments of Error."

[8] *Wagner v. Foote*, 128 Wn.2d 408, 413, 908 P.2d 884 (1996) (citing *Equity Corp. v. Milton*, 43 Del. Ch. 160, 221 A.2d 494, 497 (1966)).

[9] *Id.*

[10] 43 Del. Ch. 160, 221 A.2d 494, 497 (1966).

self-interest to be brought into conflict with the corporation's interest and may not take the opportunity for himself.[11]

Whether an opportunity is a corporate one is a conclusion of law which we review de novo.[12] Washington courts have not adopted a test for deciding what a corporate opportunity is. In the only Washington case discussing the issue, *Wagner v. Foote*,[13] the court cited *Equity Corp.* with approval and affirmed that

> [t]he corporate opportunity doctrine prohibits directors or officers from appropriating to themselves business opportunities that rightfully belong to the corporation [and] [w]hether a particular business opportunity belongs to the corporation or is personal to the individual depends upon the facts and circumstances of each particular case.[14]

Courts have taken three different approaches to determining whether there is a corporate opportunity: the "line of business" test, the "interest-or-expectancy" test, or the "fairness" test. The line of business test is the most commonly applied. Under that test, "a new business prospect constitutes a corporate opportunity if it is deemed to fall within the firm's 'line of business.' "[15] A number of jurisdictions applying this test also recognize an incapacity defense when the corporation is financially unable to pursue the opportunity.[16] The interest-or-expectancy test predates the line of business test and "proscrib[es] only those projects in which the corporation has an active commercial interest or

---

[11] *Id.*

[12] *Dempere v. Nelson*, 76 Wn. App. 403, 406, 886 P.2d 219 (1994), *review denied*, 126 Wn.2d 1015 (1995).

[13] 128 Wn.2d 408, 908 P.2d 884 (1996) (holding that the opportunity for a corporate shareholder/officer to enter into a noncompetition agreement in conjunction with the sale of corporate assets is not a corporate business opportunity, but an officer breaches his fiduciary duty if such an agreement results in the corporation's receiving less than market value of the goods).

[14] *Id.* at 413 (citation omitted).

[15] Eric Talley, *Turning Servile Opportunities to Gold: A Strategic Analysis of the Corporate Opportunities Doctrine*, 108 YALE L.J. 277, 289 (1998).

[16] *Id.* at 291.

expectancy."[17] Finally, a few jurisdictions use the fairness test under which an opportunity belongs to the corporation if appropriating it would violate " 'ethical standards of what is fair and equitable [to the corporation in] particular sets of facts.' "[18]

In this case, the trial court apparently applied the interest-or-expectancy test. It concluded that the corporate opportunity Lubrin allegedly took over was the lease agreement with the fairgrounds.[19] It found that without a lease of more than one year, Evergreen was as able as any other entity to obtain a new lease.[20] The court concluded that there was no corporate "interest" because there was no existing contractual right after the original one-year leases, and there was no reasonable "expectancy" that Evergreen would acquire the license agreements in subsequent years. We affirm the trial court's decision, but apply a different test.

■ We adopt the line-of-business test derived from the rule in *Equity Corp*. The first question is whether the complainant has shown the business opportunity is within the "line of business" of the corporation or whether the business already has an actual or expectant interest in the opportunity. The second question is whether the corpora-

[17] *Id.* at 292.

[18] *Id.* at 293 (quoting *Durfee v. Durfee & Canning, Inc.*, 323 Mass. 187, 80 N.E.2d 522, 529 (1948)).

[19] Noble cites *Comedy Cottage, Inc. v. Berk*, 145 Ill. App. 3d 355, 495 N.E.2d 1006, 1011, 99 Ill. Dec. 271 (1986) as specifically holding that there is a protectable expectancy in the renewal of a lease. *Comedy* is distinguishable from this case. There, (1) the business was well established, profitable, and negotiating a lease for the location from which it had operated for several years; (2) it was clear that the corporation was financially able to enter into the lease; and (3) the lease was under negotiation when the officer left the corporation to pursue the interest for himself.

[20] Noble argues that the court erred in finding there was no evidence that Evergreen would have obtained contract renewals because Sky Valley actually got renewals and it had less financial backing than Evergreen. But Lubrin's testimony suggested that the fairgrounds could turn an applicant down for any reason, they would not give multiple-year leases, and that Sky Valley had to advance $7,500 to obtain the new lease. This evidence, which the trial court believed, along with the fact that the only lease in evidence was for one year, is substantial evidence supporting this finding of fact.

tion has the financial ability to seize the opportunity. Because the party alleged to have appropriated a corporate opportunity generally has access to the relevant financial information, that party should bear the burden of proving financial inability. But the trial court may redistribute burdens among the parties when placing the burden of proof solely on one party is inequitable under the facts of a particular case. In this case, the first part of the test is met because the leases Lubrin pursued with the fairgrounds are squarely within Evergreen's line of business. However, because Evergreen had no financial resources with which it could pursue the leases, Lubrin has adequately established the incapacity defense. The lease was an opportunity that Lubrin could lawfully pursue on his own.

Noble argues that Lubrin cannot use the financial ability defense because he was a "material actor" in creating the insolvency of the corporation. He relies on *Aqua-Culture Technologies, Ltd. v. Holly*.[21] We disagree. Although we recognize this is an important factor in determining whether a party can use the financial ability defense, *Aqua-Culture* is distinguishable from this case in two significant ways. First, the actions that led to Evergreen's insolvency did not rise to the level of misconduct present in *Aqua-Culture*. There, the officers "grossly violated [their] fiduciary duties" by "divert[ing] corporate funds [for their] own use, misused [the corporation's] money and time, and [were] engaged in forming a duplicate enterprise in the form of a new corporation . . . to divert all of the expertise, work product and good will" from the old to the new corporation.[22] Although Noble states in his brief that Lubrin "pushed" the parties to invest additional sums of money in the Christmas lights, he fails to cite to any place in the record where this evidence was presented. The trial court made an uncontested finding that both Lubrin and

---

[21] 677 So. 2d 171, 183 (Miss. 1996) (concluding that majority shareholders may not cause the corporation's insolvency and then argue that it lacked the financial ability to seize a corporate opportunity).

[22] *Id.* at 182.

Noble made decisions about how many lights would be needed, how many should be purchased, and where they should be placed. Second, unlike *Aqua-Culture*, the trial court here made an uncontested finding of fact that there was no evidence that Evergreen had any significant value or good will, and it did not find that Lubrin misappropriated any of Evergreen's assets. Under these circumstances, the evidence supports the conclusion that, unless the parties contributed additional capital, Evergreen did not have the financial ability to pursue the leases.

II. <u>Did Lubrin violate a fiduciary duty through oppressive conduct?</u>

■ Washington has not adopted a specific test for determining whether there has been oppressive action against a shareholder. In *Robblee v. Robblee*,[23] this court applied two different and often-used tests for oppressive action. The most common of the two tests is the "reasonable expectations" test, which defines oppression as a " 'violation by the majority of the "reasonable expectations" of the [minority].' "[24] " 'Reasonable expectations' are those spoken and unspoken understandings on which the founders of a venture rely when commencing the venture."[25]

■ Noble argues that Lubrin's actions defeated his "reasonable expectation" that theirs was a long-term venture and thus breached his fiduciary duty to him. We cannot agree. If we were to accept Noble's argument, courts would have to find oppressive conduct whenever an officer/share-

---

[23] 68 Wn. App. 69, 841 P.2d 1289 (1992).

[24] *Id.* at 76 (quoting *Gimpel v. Bolstein*, 125 Misc. 2d 45, 477 N.Y.S.2d 1014, 1018 (1984)) (alteration in original). The other test, which has been called the "fair dealing" test, describes oppression as " 'burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.' " *Id.* (quoting *Gimpel*, 477 N.Y.S.2d at 1018). The two approaches are "not mutually exclusive, and will frequently be found to be equivalent. Often, however, it will be found that one or the other lends itself more nearly to the facts of the case as an appropriate analytical framework." *Gimpel*, 477 N.Y.S.2d at 1019. We need not apply these factors here because Noble's expectations were not reasonable.

[25] *Robblee*, 68 Wn. App. at 76 (citing *Gimpel*, 477 N.Y.S.2d at 1019).

holder of a closely-held, insolvent corporation chose to end the corporation rather than contribute additional money to a failed venture. Under facts like these, it is not reasonable to expect an officer/shareholder to contribute more of his own money to a failed enterprise in order to avoid breaching a fiduciary duty. Because we hold Lubrin did not breach a fiduciary duty to Noble, we need not address the question whether the trial court erred in failing to make findings concerning the advantages Lubrin obtained, monetary and nonmonetary, as a result of the breach.

We affirm.

The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. *See* RCW 2.06.040; CAR 14.

BECKER, C.J., and BAKER, J., concur.