[No. 72264-1. En Banc.]
Argued October 24, 2002. Decided February 13, 2003.

TIM SCOTT, *Respondent*, v. TRANS-SYSTEM, INC., *Defendant*, NORTHWESTERN CAREER INSTITUTE, INC., *Petitioner*.

702

*Terry W. Martin*, for petitioner.

*James A. McPhee* (of *Crumb & Munding*), for respondent.

IRELAND, J. — Northwestern Career Institute, Inc., doing business as Northwest Career Training Center seeks reversal of a Court of Appeals decision affirming judicial dissolution of the corporation. Appellants, Trans-System, Inc., and Northwestern Career Institute, Inc., argue that there is insufficient evidence to support findings that the majority shareholders acted oppressively and/or misapplied or wasted corporate assets and that, therefore, the trial court abused its discretion in ordering dissolution of the corporation pursuant to RCW 23B.14.300(2)(b) and (d). Determining that the findings of fact do not support judicial dissolution and that alternative remedies are available, we reverse the Court of Appeals and remand for determination of an alternative remedy.

FACTS

Tim Scott was employed with Trans-System, Inc. (TSI), an interstate trucking company, from August 1987 through February 1994 as director of Driver Services. Initially, TSI had an in-house driver training program. However, in 1994, TSI financed the development of a subsidiary corporation, Northwestern Career Institute, Inc., which does business as Northwest Career Training Center (Northwest). The primary reason for establishing Northwest was to provide TSI and its subsidiaries with a pool of trained drivers for use in their trucking businesses. On January 16, 1998,

Scott's employment at Northwest was terminated; in March 1998, he began his own commercial truck driver training school in the Spokane area called National Transportation Training & Consulting (National). Both Northwest and National are located in Spokane.

TSI has four shareholders and Northwest has five. TSI's four shareholders also have stock in Northwest. Scott is the fifth shareholder in Northwest.[1] Scott was asked to become the chief administrative officer and director of Northwest Career. He currently owns 18 percent of the stock in Northwest but does not own any stock in TSI. There were never any stockholder meetings for Northwest.

Northwest's accounts were kept at minimal amounts and funds from the school were funneled through the TSI account. TSI provided funding to start Northwest as well as paid its expenses—payments and funding that were considered by TSI to be loans from TSI to Northwest. Northwest had a line of credit with Washington Trust Bank for $125,000. Ted Rehwald, TSI's comptroller and vice-president, testified that $50,000 of the $125,000 was used to repay the loan from TSI to Northwest. The balance, $75,000, was treated as a loan from Northwest to TSI and was used by TSI for purposes unrelated to the school. TSI paid $75,000 to Washington Trust Bank. Northwest, however, was charged the interest on the entire $125,000 line of credit. No promissory notes were executed to evidence the loans between TSI and Northwest.

Through one of its subsidiaries, TSI leased equipment to Northwest for use by the school. Eight one-year lease agreements were entered into evidence at trial. Monthly lease payments, insurance coverage, and maintenance were the responsibilities of Northwest per the terms of the leases. In four of the eight agreements, equipment was leased for amounts equal to or exceeding the value of the

---

[1] Besides Scott, Northwest's four other shareholders and their respective percentage shares are: James C. Williams, 47.272%; Gary R. King, 16.363%; William J. Haley, 13.636%; and Dale J. Peterson, 4.545%. Williams, King, Haley, and Peterson also own all the shares of common stock in TSI.

equipment, as valued for insurance purposes. In the remaining four, equipment was leased for amounts less than the insured value of the equipment.[2] The monthly payments for each piece of equipment were based on comparable costs of rental for the same equipment. Scott signed each lease as director of Northwest.

## PROCEDURAL HISTORY

Scott filed suit against TSI and Northwest alleging breach of contract, promissory estoppel, failure to pay wages, defamation, and asking for judicial dissolution of Northwest. In a bench trial, the trial court found against Scott on the claims for breach of contract, promissory estoppel, and defamation. The court ordered Northwest judicially dissolved pursuant to RCW 23B.14.300(2)(b) and (d) due to findings of oppression and misapplication or wasting of corporate assets. Division Three of the Court of Appeals affirmed, finding no abuse of discretion. *Scott v. Trans-Sys.*, 110 Wn. App. 44, 45, 38 P.3d 379 (2002).

## ANALYSIS

Issue

Whether the trial court abused its discretion in determining Northwestern Career Institute, Inc., should be judicially dissolved based on findings of oppression and misapplication or wasting of corporate assets by the majority stockholders.

Standard of Review

■■ Judicial dissolution is in the discretion of the trial court. *Bergman v. Johnson*, 66 Wn.2d 858, 863, 405 P.2d 715 (1965). Appellate review of a trial court's findings of fact

---

[2] It can be conclusively said that two of the eight leases were extended an additional year. On one lease the payment was increased from $9,000 to $12,000 while the value of the item remained $9,000. On the second lease the payment increased from $9,750 to $12,000 and the value remained $40,000. Scott also testified that all eight leases were renewed for the four years he was at Northwest. The only evidence of this in the record is Scott's testimony. Of the leases in evidence, addenda were attached only to the two leases discussed above.

and conclusions of law for abuse of discretion is limited to determining whether the trial court's findings are supported by substantial evidence in the record and, if so, whether the conclusions of law are supported by those findings of fact. *Willener v. Sweeting*, 107 Wn.2d 388, 393, 730 P.2d 45 (1986).

Judicial Dissolution Pursuant to RCW 23B.14.300

The grounds upon which a trial court may order the dissolution of a corporation are provided in RCW 23B.14.300. That section reads, in relevant part:

> The superior courts may dissolve a corporation:
>
> . . . .
>
> (2) In a proceeding by a shareholder if it is established that:
>
> . . . .
>
> (b) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent;
>
> . . . .
>
> (d) The corporate assets are being misapplied or wasted . . . .

RCW 23B.14.300(2)(b), (d). These sections of this statute follow the Model Business Corporation Act (MBCA) § 14.30 (1999). Several other states' business corporation acts contain nearly identical sections as those above, including Arizona, Illinois, Missouri, and Oregon.[3]

 In deciding whether to grant dissolution, the trial court should consider whether that solution will be beneficial or detrimental to all the shareholders or injurious to the public. *Henry George & Sons v. Cooper-George, Inc.*, 95 Wn.2d 944, 953, 632 P.2d 512 (1981). Dissolution should not be granted as a matter of right, since the provision allowing judicial dissolution is " 'clearly couched in language of permission.' " *Id.* at 951 (quoting *Jackson v. Nicolai-Neppach Co.*, 219 Or. 560, 574, 348 P.2d 9 (1959)). "[T]he

---

[3] Ariz. Rev. Stat. § 10-1430(B)(2), (4) (1996); 805 Ill. Comp. Stat. 5/12.56(a)(3), (4) (2000) (also providing alternative remedies to dissolution); Mo. Rev. Stat. § 351.494(2)(b), (d) (2001); Or. Rev. Stat. § 60.952(1)(b), (d) (2001) (with alternative remedies to dissolution), respectively.

remedy of liquidation is so drastic that it must be invoked with extreme caution." *Polikoff v. Dole & Clark Bldg. Corp.*, 37 Ill. App. 2d 29, 36, 184 N.E.2d 792 (1962). *See also Blinn v. Almira Trading Co.*, 190 Wash. 156, 162, 66 P.2d 1132 (1937) ("The appointment of a receiver is a harsh and extraordinary remedy and will be resorted to by the courts only in extreme cases.").

■ ■ Once overreaching conduct has been demonstrated, the burden shifts to the majority shareholder or shareholders to show there were legitimate business justifications for the conduct. Under the "business judgment rule," corporate management is immunized from liability in a corporate transaction where (1) the decision to undertake the transaction is within the power of the corporation and the authority of management, and (2) there is a reasonable basis to indicate that the transaction was made in good faith. *Nursing Home Bldg. Corp. v. DeHart*, 13 Wn. App. 489, 498, 535 P.2d 137 (1975).

■ Illinois' Supreme Court has stated that in suits for dissolution, a plaintiff's claims must be considered against the backdrop of established deference to corporate governance.

> It is . . . fundamental in the law of corporations, that the majority of its stockholders shall control the policy of the corporation, and regulate and govern the lawful exercise of its . . . business. . . . and courts of equity will not undertake to control the policy or business methods of a corporation, although it may be seen that a wiser policy might be adopted and the business more successful if other methods were pursued.

*Wheeler v. Pullman Iron & Steel Co.*, 143 Ill. 197, 207-08, 32 N.E. 420 (1892) (citations omitted); *see Nursing Home Bldg. Corp.*, 13 Wn. App. at 498 ("Courts are reluctant to interfere with the internal management of corporations and generally refuse to substitute their judgment for that of the directors.").

A. The Relevant Findings of Fact

The trial court determined that the directors of TSI and Northwest acted oppressively and misapplied or wasted

corporate assets. Accordingly, it ordered Northwest be dissolved pursuant to RCW 23B.14.300(2)(b) and (d). The findings of fact upon which this conclusion rests read as follows:

### XIII.

Approximately two years prior to Mr. Scott's termination, Northwest had a line of credit with Washington Trust Bank in the amount of $125,000.00. A portion of that line of credit was utilized by TSI but Northwest had to pay the interest thereon. Despite Mr. Scott's protests, Northwest made said interest payments for approximately 1.5 years prior to Mr. Scott's termination. TSI's comptroller, Ted Rehw[a]ld, testified that this arrangement was considered a repayment for some loans between TSI and Northwest. Mr. Rehw[a]ld further testified that, in hindsight and upon further review, this arrangement was not proper. In addition, the court was not provided with any proper accounting for said loan and interest payments.

### XIV.

TSI, through one of its subsidiaries, leased equipment (tractors and trailers) to Northwest, for use in its business. Several such leases were entered into evidence. In some of the lease agreements, the sum of the lease payments over the term of the lease exceed the equipment's stated actual value. Mr. Scott requested of James Williams that he be allowed to purchase said equipment under said leases rather than pay more in lease payments but was refused this opportunity. As such, TSI profited at Northwest's expense.

Clerk's Papers at 43. In essence, TSI challenges the trial court's conclusions that TSI's conduct regarding the leases and the credit line constitutes evidence of oppression or wasting of corporate assets. Accordingly, TSI asserts that the trial court abused its discretion in ordering the dissolution.

### B. Tests For Oppression

■ RCW 23B.14.300 does not define the term "oppressive," nor does the MBCA. The Court of Appeals first addressed the question of what constitutes "oppressive" conduct, in the context of RCW 23B.14.300, in *Robblee v.*

*Robblee*, 68 Wn. App. 69, 841 P.2d 1289 (1992). Given the dearth of Washington case law on the subject, that court adopted two tests used by other jurisdictions to define oppressive conduct. The first, called the "reasonable expectations" test, defines oppression as a violation by the majority of the reasonable expectations of the minority. *Robblee*, 68 Wn. App. at 76 (citing *Gimpel v. Bolstein*, 125 Misc. 2d 45, 477 N.Y.S.2d 1014 (Sup. Ct. 1984)). " 'Reasonable expectations' are those spoken and unspoken understandings on which the founders of a venture rely when commencing the venture." *Robblee*, 68 Wn. App. at 76. Application of the reasonable expectations test is most appropriate in situations where the complaining shareholder was one of the original participants in the venture— one who would have committed capital and resources. *See Gimpel*, 125 Misc. 2d at 51.

The second test describes oppression as:

> "burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely."

*Robblee*, 68 Wn. App. at 76 (quoting *Gimpel*, 125 Misc. 2d at 50-51). These two tests are not mutually exclusive and one or both may be used in the same case, depending on the facts. *Gimpel*, 125 Misc. 2d at 51. Oregon's Supreme Court has noted that oppressive conduct by majority shareholders is closely related to the fiduciary duty of good faith and fair dealing owed by them to the minority shareholders. *Baker v. Commercial Body Builders*, 264 Or. 614, 629, 507 P.2d 387 (1973).

### C. The Leases

Scott argues that TSI unilaterally profited at Northwest's expense from the four leases where payments over the term exceeded the value of the equipment. This, Scott claims, combined with Williams' alleged repeated refusal to allow

purchase rather than lease of the equipment, demonstrates oppressive conduct and waste of assets. He asserts that these facts, reflected in finding of fact XIV, support the trial court's conclusion that the majority shareholders acted oppressively and wasted corporate assets, thereby warranting dissolution. The trial court agreed, concluding that this evidence met the statutory requirements for judicial dissolution.

■ Under both tests, the complaining shareholder has the burden of proof, by a preponderance of the evidence, to establish the requisite jurisdictional facts and the equitable grounds for dissolution. *See Fix v. Fix Material Co.*, 538 S.W.2d 351, 357 (Mo. Ct. App. 1976). *See also Logan v. Logan*, 36 Wn. App. 411, 418, 675 P.2d 1242 (1984); MBCA § 14.30 official cmt. 2(b) (1999). Application of the reasonable expectations test for oppression is not straightforward in this case. Scott claims that the leases are oppressive under either test for oppression provided in *Robblee*, but there is no indication in the record as to what the reasonable expectations of the parties were or whether Scott invested any of his own money to facilitate the incorporation and development of Northwest. The record indicates that the money for the business start-up was provided by TSI. Scott was given his shares in TSI when he was asked to be the director. Thus, as *Gimpel* provided, application of the reasonable expectations test is not appropriate in this case.

Cases applying the second test of oppression are illustrative. Washington's Court of Appeals and Oregon's Supreme Court have rigorously required that plaintiffs meet their burden to successfully request involuntary dissolution, reflecting courts' reluctance to order a corporation dissolved. In *Robblee*, the minority shareholder tried to show that the majority shareholder acted oppressively with evidence of fighting that occurred between the two and by the fact that the majority shareholder fired the minority shareholder, tried to have him removed as an officer and director, and changed organization of the corporation in order to take

over the minority shareholder's functions. The court disagreed, noting that there were legitimate and reasonable explanations for the conduct characterized by the minority as oppressive. *Robblee*, 68 Wn. App. at 75-77. The court concluded that under either test, the factual findings did not support a finding of oppression. *Id.* at 76.

The Oregon Supreme Court applied the second oppression test in *Baker* where that court affirmed the trial court's refusal to dissolve a corporation (Commercial Body Builders, Inc.) for asserted oppressive behavior because plaintiff-minority shareholder had not met his burden. *Baker*, 264 Or. at 617. There, the minority shareholder was prevented from viewing corporate records and was not notified of certain corporate meetings. *Id.* at 622. He also asserted that the majority attempted to force plaintiff to sell his shares by threat of operating the business so as to show no profits. *Id.* at 621-22. Plaintiff was terminated as a salesman for unsatisfactory performance and, shortly after, he and his wife were voted out as directors and officers. *Id.* at 622. Plaintiff did not sell his shares. *Id.* The court disagreed with plaintiff that this conduct was oppressive. *Id.* at 617.

After terminating plaintiff and removing him as a director and officer with Commercial, the majority shareholder organized a new corporation, Hydro, which quickly became indebted to Commercial for money advanced for equipment and labor lent by Commercial's workers. *Id.* at 623-24. The court also rejected this as evidence of oppression because there was no direct proof that the debt caused Commercial any actual loss. *Id.* at 624. There was evidence that Hydro would be able to repay the debt shortly. *Id.*

The court in *Baker* summarized what it would consider to be oppressive conduct:

[A]n abuse of corporate position for private gain at the expense of the stockholders is "oppressive" conduct. Or the plundering of a "close" corporation by the siphoning off of profits by excessive salaries or bonus payments and the operation of the business for the sole benefit of the majority of the stockholders, to the detriment of the minority stockholders, would constitute

such "oppressive" conduct as to authorize a dissolution of the corporation . . . .

*Baker*, 264 Or. at 629-30 (footnotes omitted).

The initial question in this case is whether Scott has met his burden to show oppression, thereby shifting the burden to TSI to show the majority acted in good faith and that the decisions were reasonable business judgments. Scott argues that the four leases and Williams' refusal to allow Northwest to purchase rather than lease the equipment evidence a lack of fair dealing in the affairs of Northwest to the detriment of the minority shareholders. TSI believes that Scott has not met his burden because, it claims, he did not present evidence that the leases were unfair or that Northwest could have leased the same or similar equipment for less money elsewhere. TSI points out that Williams gave uncontroverted testimony that the lease payments were based on the market lease-value for each piece of equipment and that the four other leases were for amounts far less than the insurance value of the equipment.

TSI's argument is persuasive. Scott's assertions amount to a showing that there are four leases where total payments exceeded the value of the equipment by not more than $3,000. The record also shows there are four other leases where total payments were as much as $40,000 *less* than the value of the equipment. Before the burden falls to TSI to show the legitimacy of the leases, Scott must first show, by a preponderance, that there was wrongdoing on the part of the majority shareholders. Had Scott showed that Williams disregarded clear evidence that purchasing rather than leasing the equipment would be cheaper for Northwest, he might have met his burden. Or, had Scott demonstrated that the equipment could have been leased at cheaper rates from a third party lessor rather than the TSI subsidiary, he might have met his burden. However, without more, Scott has fallen short of his burden. Based on the evidence presented it was an abuse of discretion for the trial

court to conclude that the leases were oppressive or a waste of corporate assets.

## D. Use of Credit Line

The trial court concluded that it was oppressive and a waste of assets for TSI to use $75,000 of the $125,000 credit line that was in Northwest's name, while Northwest paid interest on the entire amount. Scott's testimony indicates that when he became aware that Northwest was paying interest on the entire $125,000, having not used any portion of it according to him, he took the issue up with each of the other shareholders in Northwest. Scott claims that each gave him unsatisfactory justifications for the payment of interest.

According to Scott, the four other shareholders were aware the credit line was being used entirely by TSI yet Scott, as director of Northwest, was unaware of the situation until he received a payment notice from the bank. This evidence creates a viable claim of overreaching by the majority shareholders. Since Scott has met his initial burden, the burden shifts to TSI to demonstrate legitimate reasons for the use of the credit line and Northwest's payment of the interest. TSI's comptroller and vice-president, Ted Rehwald, testified that $50,000 of the credit line was treated as repayment of a loan from TSI to Northwest, upon which TSI charged no interest. The remaining $75,000 was used exclusively by TSI, yet Northwest paid the interest on that sum as well. Rehwald testified that the $75,000 was perceived as a loan from Northwest to TSI. Explaining the rationale behind having Northwest pay the interest, Rehwald testified as to his belief that the interest Northwest paid on its $75,000 loan to TSI was roughly equal to the interest Northwest should have been charged on the initial loan from TSI. TSI's testimony attempted to provide a rational business judgment for its conduct. In retrospect, Rehwald acknowledged that TSI should have been required to pay the interest on the $75,000 of the credit line it used.

██ Statements by Oregon's Supreme Court in *Baker* assist in determining whether Rehwald's justifications are sufficient to refute a claim of oppression:

> [A] single act in breach of such a fiduciary duty may not constitute such "oppressive" conduct as to authorize the dissolution of a corporation unless extremely serious in nature and that even a continuing course of "oppressive" conduct may not be sufficient for that purpose unless it appears that, as a result, there has been a disproportionate loss to the minority or that those in control of the corporation are so incorrigible that they can no longer be trusted to manage it fairly in the interests of its stockholders.

*Baker*, 264 Or. at 630 (footnotes omitted); *see also Fix*, 538 S.W.2d at 358 ("We do not mean that a single act in breach of such duty would be sufficient 'oppressive' conduct to authorize dissolution of a corporation (unless extremely serious), absent evidence of irreparable injury, imminent danger of loss or miscarriage of justice."). "Mistakes, inadvertence, or bad policy, if honestly pursued will not warrant the appointment of a receiver." *Blinn*, 190 Wash. at 163.

██ The credit line transaction should not be considered oppressive, warranting involuntary dissolution, as this appears to be isolated. Moreover, there is no indication TSI has routinely conducted business in this manner or that it will continue to do so. The public does not benefit from the dissolution of Northwest because it decreases its choices in schools. Without Northwest, the only other school in the Spokane area is Scott's company, National. Scott is therefore the only shareholder who stands to benefit from Northwest's dissolution; such action would be detrimental to the other four. Considering the severity of the conduct and the interests of the shareholders and the public, dissolution in this case is an overly harsh remedy. Alternative remedies exist that would rectify any wrongdoing while maintaining the corporate entity.

Alternative Remedies to Dissolution

██ Dissolution suits under Washington's dissolution statute are fundamentally equitable in nature. *Henry*

*George & Sons*, 95 Wn.2d at 952. Relying on this equitable nature, both Oregon's Supreme Court and Missouri's[4] Court of Appeals stated that the court may consider alternative equitable relief besides dissolution. *Fix*, 538 S.W. 2d at 357. In *Baker*, the court summarized the equitable remedies that various jurisdictions had used depending on the facts of the case, the most relevant of which include:

(a) The entry of an order requiring dissolution . . . at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;

(b) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until all differences are resolved or "oppressive" conduct ceases;

(c) The appointment of a "special fiscal agent" to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;

(d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or "special fiscal agent";

(e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;

. . . .

(j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result of "oppressive" conduct by the majority in control of the corporation.

*Baker*, 264 Or. at 632-33 (footnotes omitted); *see also Fix*, 538 S.W.2d at 357 n.3; *Sauer v. Moffitt*, 363 N.W.2d 269, 274-75 (Iowa Ct. App. 1984) (allowing courts ability to provide other equitable remedies pursuant to former Iowa Code § 496A.94(1) (now Iowa Code § 490.1430 ((West) 2002)), which is essentially the same as Washington's). Accordingly, alternative remedies are available that are far

---

[4] Recall that Missouri's business corporation act is based on the MBCA as well.

less severe than dissolution. For example, TSI could have been required to produce an accounting of the money it loaned to Northwest and the interest it would have charged as compared to the interest paid by Northwest on the line of credit used by TSI. If there were a difference in the interest amounts, the respective corporation could then repay that amount. Although the trial court suggested to the parties that they attempt to resolve the case themselves, after those attempts failed there is no indication that the trial court considered less severe equitable solutions that would effectively remedy the situation. The court instead judicially dissolved the corporation. However, the facts of this case do not rise to the level of egregiousness required to justify dissolution given the admonishments from courts in this state and around the country that dissolution is a drastic remedy that should be used with extreme caution. We find that the trial court abused its discretion in ordering the dissolution of Northwest without consideration of alternative relief.

## CONCLUSION

RCW 23B.14.300(2)(b) and (d) grant superior courts discretion to dissolve a corporation when those in control of the corporation are acting oppressively or are wasting or misapplying corporate assets. Scott did not meet his burden to show the leases were oppressive or a waste of assets. Concerning the leases, we hold that the findings of fact do not support a finding of oppression or waste of Northwest's assets because there is no indication Northwest was harmed or suffered a loss as a result of the leases. While the use of the line of credit in Northwest's name is indicative of overreaching by TSI and the majority shareholders, there is no indication such conduct by TSI was typical or would continue. We hold that the conduct does not rise to the level of oppressive conduct or waste sufficient to warrant dissolution. The trial court abused its discretion because a remedy as severe as involuntary dissolution is not supported by findings of fact XIII or XIV. Dissolution is an

overly harsh remedy for any harm caused Northwest and alternative remedies exist that would effectively remedy the situation. The Court of Appeals is reversed and the case remanded for evaluation and application of an alternative remedy to dissolution consistent with this opinion.

ALEXANDER, C.J.; JOHNSON, MADSEN, SANDERS, BRIDGE, CHAMBERS, and OWENS, JJ.; and SMITH, J. PRO TEM., concur.